OPINION OF THE COURT
John J. Connell, J.
The above-named defendant was indicted by the Erie County Grand Jury on charges of murder in the second degree and criminal possession of a weapon in the second degree involving an alleged incident on August 16, 1983, in which William Fugate was shot to death by the defendant.
In the case at bar, the defense, both in the voir dire and opening statement to the jury, had raised the defense of justification claiming that the defendant shot and killed William Fugate in self-defense. Mention was also made by defense counsel in his opening statement of the victim and defendant’s participation with the Community Dispute Resolution Center prior to the fatal shooting. Because of these statements the District Attorney subpoenaed any and all records pertaining to such mediation between the defendant and the victim and involving a third person, Deborah Nelson.
Attorneys for the Better Business Bureau Foundation which *138 administers the Community Dispute Resolution Center program in Erie County served an order to show cause on the District Attorney’s office, signed June 7, 1985 and made returnable on June 10, 1985, seeking that the said subpoena be quashed pursuant to CPLR 2304. On the return date arguments were heard from the attorney for the Better Business Bureau Foundation, the District Attorney’s office and defense counsel for George Snyder. Subsequent to the oral argument, and after review of the paper submitted in support of and in opposition to the motion, and upon review of the applicable statutory law, the motion to quash the subpoena was granted. There appears to be no reported case construing Judiciary Law § 849-b (6).
The Community Dispute Resolution Center’s program was established in 1981 by the New York State Legislature to enable the creation of community dispute centers to resolve neighborhood and interpersonal disputes. The goal of the Legislature in creating these centers was to provide a "quick, inexpensive and voluntary resolution of disagreements, while at the same time serving the overall public interest by permitting the criminal justice community to concentrate its resources on more serious criminal matters.” (1981 McKinney’s Session Laws of NY, at 2630.) It was the feeling of the Legislature that in order for such programs to be successful, the parties availing themselves of the services of these forums must feel that they can air their disputes "in an informal atmosphere without restraint and intimidation.” (L 1981, ch 847, § 1.)
In order to assure confidentiality to the parties involved, and thereby encourage their full, frank, and open participation, Judiciary Law § 849-b (6) was enacted as follows: "Except as otherwise expressly provided in this article, all memoranda, work products, or case files of a mediator are confidential and not subject to disclosure in any judicial or administrative proceeding. Any communication relating to the subject matter of the resolution made during the resolution process by any participant, mediator, or any other person present at the dispute resolution shall be a confidential communication.”
In spite of the first sentence in this statute, there appears nowhere else in the article an exception to the restrictive language of the statute.
I find that even if the defendant can be found to have waived the confidentiality of the records pertaining to the mediation sessions in which he was involved, the statute, as *139 drafted, permits no such waiver. The items sought by the District Attorney are by definition "confidential communications.”
Confidential communications are, by their very nature, guided by rules of exclusion. Most commonly rules of exclusion are drafted to prevent evidence being presented to a jury that is of no probative value or of a kind that may unfairly prejudice one of the parties or misdirect the jury’s attention from the primary issue at hand. The confidentiality of certain communications, however, is meant to nurture very specific interpersonal or professional relationships that the courts, society and the Legislature deem desirable. (Fisch, New York Evidence § 511, at 335 [2d ed].)
The Court of Appeals recently strictly construed Public Health Law § 2306 which relates to information concerning sexually transmittable diseases. That section reads as follows: "All reports or information secured by a board of health or health officer under the provisions of this article shall be confidential except in so far as is necessary to carry out the purposes of this article.” In Matter of Grattan v People (65 NY2d 243), the court held that the goal of the statute cannot be defeated simply by the consent of the source to release the information. "The requirement of confidentiality (Public Health Law § 2306) is integral to a statutory scheme designed to encourage afflicted persons to seek and secure treatment, which in the case of communicable disease serves individual interests as well as those of society.” (Matter of Grattan v People, supra, at p 245.)
Section 849-b (6) is even more restrictive in its language by specifically referring to excluding disclosure from "any judicial or administrative proceeding.”
Section 849-b (4) (a) places funding for the dispute centers in jeopardy unless "it complies with the provisions of this article and the applicable rules and regulations of the chief administrator”. The intent of the Legislature to provide forums for the resolutions of disputes as alternatives to structured judicial settings is, therefore, clearly defined in the statutory language itself as well as the funding provisions for the dispute centers.
To grant the District Attorney’s request to review the records of the Community Dispute Resolution Center would subvert the Legislature’s clear intention to guarantee the confidentiality of all such records and communications.
*140 Accordingly, the subpoena is hereby quashed.
*173 of respondent was the result of whim or caprice; rather, it is the lawfulness of the assignment which respondent challenges. School attendance is compulsory for youngsters in New York City under 17. (Education Law § 3205 [3].) Enforcement power is specifically conferred on certain school officials: "A supervisor of attendance, attendance teacher or attendance officer, as the case may be, may arrest without warrant any minor who is unlawfully absent from attendance upon instruction.” (Education Law § 3213 [2] [a].) Respondent argues that this grant of authority is exclusive. The presentment agency, on the other hand, contends that the Education Law must be read together with NY City Charter § 435 (a) which confers upon the police the power and duty, "to preserve the public peace, prevent crime, detect and arrest offenders * * * protect the rights of persons and property, guard the public health * * * enforce and prevent the violation of all laws and ordinances in force in the city”.
We conclude that the deployment of police to pick up truants is a legitimate exercise of police power and hold that Officer Farrell was performing a lawful duty when he was injured by respondent. In so holding we are fully cognizant that respondent’s conduct in leaving the school on the morning of February 13 was not criminal and that the "arrest” which the Education Law authorizes is, in fact, a noncriminal detention, rather than an arrest in the classic, criminal law sense. The police, however, properly have many other lawful functions besides the enforcement of the criminal law. The "multiplicity and complexity” of the police role in a democratic society has been judicially recognized, and the Court of Appeals has cautioned, "To consider the actions of the police solely in terms of arrest and criminal process is an unnecessary distortion.” (People v De Bour, 40 NY2d 210, 218 [1976].)
We are also aware of a disparity in that respondent’s conduct, if directed against an attendance teacher trying to return him to school, would constitute third degree assault, assuming the specific intent to cause physical injury could be established, whereas respondent here is charged with second degree assault because a police officer was involved. The Legislature might wish to consider adding attendance teachers to those public servants included in the second degree assault provisions. The disparity which exists at present, however, does not undermine the lawfulness of the performance of this duty by a police officer. It is the office rather than any specific function of the office which enjoys the special protection of the *174 second degree assault statute. (People v Wheeler, 59 Misc 2d 825 [County Ct, Chemung County 1969], affd 36 AD2d 549 [3d Dept 1971].)
The compulsory education law is fundamentally a child protective statute, intended to insure to every child the schooling he needs to function in the adult world. The problem of truancy in New York City, however, has reached crisis proportions, going beyond the interests of the individual child to have an economic and social impact on the life of the entire city. Statistics compiled in 1983 revealed that more than one third of New York City high school students were chronically absent from school without excuse.[3] That most of these undereducated young people are unemployable upon leaving school is self-evident. The correlation between school failure and juvenile crime is also widely recognized,[4] and crime prevention appears to have been the primary purpose for the institution of the Truancy Patrol Program.[5]
The conduct of the police in exercising crime prevention functions must be subject to close judicial scrutiny because of the inherent potential for abuse. (People v De Bour, supra.) The duty performed by Officer Farrell as a member of the truancy patrol withstands such scrutiny. Certainly the function performed is properly an executive one, so that the separation of powers is in no way compromised. Neither does the procedure condone or invite free-wheeling police intervention in the lives of juveniles. {See, People v Collier, 85 Misc 2d 529 [Sup Ct, NY County 1975].) Unlike the police activity in Matter of Musso (102 Misc 2d 934 [Fam Ct, Monroe County 1980]), cited by respondent, Officer Farrell’s conduct in the present case was a straightforward and circumscribed response to a well-defined and statutorily proscribed activity, truancy.
The instant case is also readily distinguishable from Matter of Michael G. (99 Misc 2d 699 [Fam Ct, Rockland County 1979]), where a charge of resisting arrest was not sustained because of the absence of an authorized arrest, an essential element of the crime of resisting arrest. (People v Harewood, *175 63 AD2d 876 [1st Dept 1978].) Here the charge is not resisting arrest, and the presentment agency need not show a valid criminal arrest; it is sufficient that the presentment agency has proved that Officer Farrell was engaged in the performance of a lawful duty, to wit, the noncriminal detention of respondent for truancy.
The presentment agency having carried its burden of proof at the fact-finding hearing, the matter is set down for disposition on September 17, 1985. The Probation Department and Family Court Clinic are to prepare reports to submit to the court on that date. Respondent’s parole is continued to that date.

. New York Times, Jan. 9, 1983, at p 1, col 3.

. Crime Prevention: Juveniles as Potential Offenders, 1 Encyclopedia of Crime and Justice 366 (Kadish ed 1983).

. See, n 2, supra, at p 172. As the memorandum of truancy, cited above, indicates, the Truancy Patrol Program has enjoyed considerable success in crime prevention, particularly in Staten Island, with a reduction by 34% in felony and misdemeanor complaints during school hours in the 1983/1984 school year compared to the previous school year.