OPINION OF THE COURT
Lewis R. Friedman, J.
This is an ejectment action. Plaintiffs move for an order seeking to have the defendant immediately vacate her apartment in plaintiffs’ building. The motion seeks to enforce a written "agreement”, denominated an "award”, entered into by the parties as a result of nonjudicial "mediation-arbitratian” of a dispute which originated in the Criminal Court.
The facts of this case are typical of the more than 100,000 actions which have been diverted from the criminal process into alternative dispute resolution over the past 10 years. For nearly 20 years, defendant Brockett rented an illegal basement apartment in plaintiffs’ two-family house. In December 1989, this court precluded the collection of rent or "use and occupancy” payments on the ground that, according to the certificate of occupancy obtained by plaintiffs long after they rented the apartment to defendant, the basement apartment was illegally occupied (see, Multiple Dwelling Law § 302 [1] [a], [b]). Relations between the parties have degenerated. Defen *1033 dont, contending that plaintiffs had turned off the heat and committed other acts, filed a Criminal Court complaint alleging harassment, reckless endangerment and other crimes; plaintiffs cross-complained of harassment. In accord with the usual practice in the Criminal Court, the parties were referred to the local dispute resolution center, which in Manhattan and the Bronx, is the IMCR Dispute Resolution Center. At a session with a "mediator-arbitrator”, the parties "resolved” their dispute. An agreement, labeled an "award”, was signed by all parties and the mediator-arbitrator. One of the agreement’s provisions was that "Ms. Brockett agrees to relinquish Mr. Wright’s apartment on or before Tuesday, July 31, 1990 at the close of the day.” Ms. Brockett, however, has refused to vacate. After plaintiffs unsuccessfully sought additional assistance from the mediator, they brought this proceeding.
Defendant argues that the IMCR Dispute Resolution Center was not a competent forum to resolve the dispute, that she only agreed because the situation at the apartment was so unpleasant, that she was unrepresented at the Center, that the mediator failed to explain her rights to her, and that there was no consideration for the agreement. The court has found no published cases analyzing enforcement problems presented by the alternative community dispute resolution procedures which have become central features in the disposition of many cases brought in the criminal courts.
Alternative Dispute Resolution
Annually, thousands of interpersonal disputes are brought to criminal courts for resolution. It has long been acknowledged by experts in the field that the criminal courts are ill-suited to the resolution of nonviolent disputes between neighbors. Alternative dispute resolution (ADR) is a process by which appropriate cases, which cannot be handled successfully by the courts,[1] are referred to a nonjudicial forum for resolution by trained mediators. Theoretically, nonjudgmental, out-of-court proceedings will give the parties time to be heard and an opportunity to "air” their grievances and to "work out” *1034 their underlying problems, without, as the courts must, focusing on proof and punishment. Practice shows that, in the main, the theory works.
New York’s earliest formal ADR program started in 1972 in Rochester, where the American Arbitration Association sponsored an effort to resolve a limited class of cases referred from the courts. The success in Rochester, one of the first programs in the United States, was copied throughout this State and nationally. Although IMCR was organized in 1969, it began taking cases from the Summons Part of the Criminal Court in New York County in 1975. "The programs have proved to be immensely successful” (Letter of Mayor Koch to Governor Carey, July 6, 1981, Bill Jacket, L 1981, ch 847). By 1981, there were 17 privately funded programs functioning in 15 counties throughout the State. The Legislature formally acknowledged the crucial importance of diversion of cases from the court system and the advantages of ADR. It noted that "[t]he involved procedures and the attendant constraints [of the court system] are not always conducive to affording the present assurance to the public and persons involved against the recurrence of such [socially undesirable] conduct” (L 1981, ch 847, § l).[2]
The Legislature decided to fund community-based dispute resolution centers on a State-wide experimental basis by enacting Judiciary Law article 21-A, which also contains the detailed statutory scheme permitting diversion from the criminal courts (L 1981, ch 847). "New York State Courts are currently overburdened with cases involving minor neighborhood and interpersonal disputes” (approval mem, 1981 McKinney’s Session Laws of NY, at 2630). Once adequate funding was provided, ADR programs multiplied rapidly. By 1984, when ADR was made a permanent part of the criminal process (L 1984, ch 156), there were programs in 37 counties (see, Sise, ABA Special Committee on Dispute Resolution, Problem Solving through Mediation, at 16-17 [1984]). According to the most recent report by the Office of Court Administration (OCA) there are now ADR programs in all 62 counties. *1035 In both 1988/1989 and 1989/1990 there were approximately 40,000 referrals to ADR from courts, prosecutors and police. Almost 20,000 cases were resolved by agreement or arbitration each year (OCA, Community Dispute Resolution Centers Program, Annual Report, Mar. 31, 1990, at 36 [Annual Report]). ADR has become a most important part of the system; more than 450,000 persons have been involved in the more than 150,000 nonjudicial resolutions since the system began (OCA, State of the Judiciary, at 79 [1990]).
ADR programs are an efficient, cost-effective means of disposing of conflicts. The average time from intake to disposition ranges from 14 days, when there is only one hearing, to 32 days, when there are multiple hearings (Annual Report, at 38). Clearly ADR cases are disposed of much faster than in the criminal courts. For 1989/1990 the cost to the State for ADR was much less than for the criminal courts: only $58.51 was spent for each case screened as appropriate for ADR and $122.17 for each arbitration or mediation actually held (Annual Report, at 49). A recent estimate is that each case disposed of through ADR saves the court system "as much as $2500” (OCA, State of the Judiciary, at 80 [1990]).[3]
Although cases are disposed of rapidly, substantial time is devoted to each hearing. The average time consumed by each arbitrated or mediated case is 83 minutes (Annual Report, at 38). Dispositions in the criminal courts, unfortunately, devote much less time to the parties.
Once a case is referred to an ADR center various techniques are used to resolve it. ADR programs throughout the State use mediators, arbitrators, or both; they are all community-based volunteers, who have received at least 25 hours of classroom training in conflict resolution techniques given by State-certifled trainers followed by an on-the-job apprenticeship as well as in-service training. (Annual Report, at 12; see, Judiciary Law § 849-b [5]). The mediator-arbitrators serve in mediations, where the parties are encouraged to reach mutually acceptable agreements, as well as arbitrations, where they render *1036 binding decisions. Some ADR programs also use a "med-orb” modality where the parties agree that a mediated agreement may be entered as an arbitration award, or if there is a failure to agree, the matter is referred to the arbitrator for a decision (Underhill & Powers, Confidentiality in Community Dispute Programs: Recent Developments, ABA Standing Committee on Dispute Resolution, Expanding Horizons: Theory & Research in Dispute Resolution, at 92-93 [1989]). During efforts at conciliation, mediation or arbitration, the parties may be represented by counsel. Those who support ADR argue that counsel is often not necessary. Also, in an effort to obtain a frank and open discussion of the issues, all statements and documents involving the case are confidential and may not be used in any proceeding for any purpose (Judiciary Law § 849-b [6]; People v Snyder, 129 Misc 2d 137; United States v Gullo, CR 87-54E, US Dist Ct, WD NY, Aug. 17, 1987; Underhill & Powers, op. cit., at 95-107).
Enforcement of ADR Determinations
If a dispute is submitted to ADR and there is a written agreement consenting to arbitration, the resulting award will be enforceable. That is, the successful party may proceed under CPLR article 75 to obtain a judgment on the award. The award will be enforced regardless of the nature of the dispute. As Justice Sklar held in Rothchild v Diamond (132 Misc 2d 701), the ADR program created by Judiciary Law article 21 was intended to, and did, carve out an exception to the general rule that violations of the criminal law are not arbitrable. Awards may enjoin future criminal activity or other conduct or may order restitution in amounts up to the limits of the Small Claims Courts and, in certain instances, up to $5,000 (Judiciary Law § 849-b [4] [e]). The form of the award does not preclude enforcement (Rothchild v Diamond, supra, 132 Misc 2d, at 703-704). Without doubt, had the "award” in this case been rendered as a result of an arbitration properly consented to in writing, the court would enforce it. IMCR is a proper forum to resolve the dispute and the form of relief is suitable to be reduced to judgment.
The record before the court does not contain any proof of a consent to arbitrate. The court has also reviewed all papers filed at IMCR; they do not contain a signed consent. The "award”, on the usual IMCR form, states, immediately above the parties’ signatures: "the parties to this agreement *1037 HEREBY AUTHORIZE THE MEDIATOR-ARBITRATOR(s) WHOSE SIGNATURES APPEAR BELOW TO INCORPORATE ALL OF THE ABOVE PROVISIONS INTO THEIR ARBITRATION AWARD FOR THE ABOVE NOTED CASE, IN ACCORDANCE WITH THEIR SUBMISSION TO MEDIATION-ARBITRATION.” That statement is obviously, by itself, not a consent to arbitrate. Rather, it refers to some other "submission” document; certainly it does not advise unrepresented parties that their agreement to mediate their dispute would be treated as though it were a legally enforceable arbitration award. It is axiomatic that arbitration, absent specific statutory authority, can only result from the agreement of the parties (cf., CPLR 7501, 7511 [b] [2] [ii]).
The papers before the court do not specify what procedure plaintiffs are invoking; presumably plaintiffs seek to confirm the "award” pursuant to CPLR 7510. However, confirmation may be denied and the award may be vacated pursuant to CPLR 7511 (b) (2) (ii) on the ground that "a valid agreement to arbitrate was not made.” That ground may only be relied on if the objecting party did not participate in the arbitration (see, Matter of Harris [East India Trading Co.], 16 Misc 2d 87, 89), since participation of a party is deemed to be a waiver of any objection to the arbitration (Matter of White Rose Tea [Meyer], 58 AD2d 544). Thus vacatur here on that ground is unavailable. However, the record in this case shows that the "arbitration” hearing did not comply with the CPLR. The arbitrator apparently did not hear any evidence as required by CPLR 7506 (b). Although the CPLR appears to permit the parties to consent to an award without the taking of testimony, any waiver of a hearing must be in writing (CPLR 7506 [f]). (The statute also permits waiver "if the parties continue with the arbitration without objection”, but obviously that alternative does not apply in cases, such as the one at bar, where there was, in fact, no arbitration.) Thus, if the document before the court is to be treated as an arbitration "award”, the motion to confirm it is denied and the "award” is vacated on the ground that there was a "failure to follow the procedure” of CPLR article 75 (CPLR 7511 [b] [iv]).[4]
*1038 That does not end the inquiry. The "award” is, at the very least, a mediation agreement between the parties. It would, therefore, be subject to enforcement as a contract. The papers before the court may be treated as though they were a motion for summary judgment in the action, since there has been joinder of issue. The law clearly favors stipulations between parties, which resolve their disputes without court adjudication. Stipulations of settlement are enforceable as contracts and are not lightly set aside (Bond v Bond, 260 App Div 781, 782). Defendant contends that there was no consideration for her agreement; however, the resolution of the criminal cross complaints is sufficient to support the award. Agreements between parties to compromise criminal cases are usually void and unenforceable. It is a class A misdemeanor to agree to accept or to confer any benefit "upon an agreement or understanding that [a person] will refrain from initiating a prosecution for a crime” (Penal Law § 215.45). That section derived from Penal Law of 1909 § 570 and Penal Code of 1881 § 125 essentially restates a common-law rule prevalent before independence. In the earliest civil cases the courts analyzed the English rule and found that any agreement to prevent prosecution was void (Steuben County Bank v Mathewson, 5 Hill 249, 251-253; Conderman v Trenchard, 58 Barb 165, 169). "The rule is everywhere recognized that agreements to forbear prosecution * * * are contrary to public policy, and void” (Buffalo Press Club v Greene, 5 Misc 501, 508, affd 86 Hun 20, 21; Porter v Havens, 37 Barb 343, 348). Since the payment of "hush money” is illegal, a contract to make that type of payment is void (Fellows v Van Hyring, 23 How Prac 230, 232). The court finds that the Legislature, in adopting Judiciary Law article 21-A, specifically intended for the parties to resolve their disputes through ADR and to abandon pending or threatened criminal prosecution. The newly declared public policy supersedes that found in the common-law cases. Therefore, ADR agreements which involve monetary settlements in exchange for discontinuation of proposed or pending criminal charges are not void.
*1039 This case is really a landlord-tenant dispute. Stipulations settling landlord-tenant disputes are so favored that parties may waive nearly all statutory and constitutional rights (cf., Matter of Matinzi v Joy, 60 NY2d 835). However, in this Department stipulations made in Housing Court to surrender possession of a tenant’s home are subject to special scrutiny (Solack Estates v Goodman, 102 Misc 2d 504, affd 78 AD2d 512; Weehawken St. Assocs. v Estate of Nudorg, NYLJ, Mar. 26, 1991, at 21, col 3 [App Term, 1st Dept]). The Housing Court uses lay mediators to resolve many cases; yet, all proposed stipulations are presented in open court for a Housing Judge to review with the parties. It is contrary to sound public policy for the court to give an out-of-court agreement, between an unrepresented tenant and a landlord made after discussions with a lay mediator, greater effect than would be accorded to a similar stipulation entered into in open court before a Judge of the Housing Court. This agreement must be viewed on the same terms as a Housing Court stipulation. On the facts presented here, the court cannot conclude that the agreement represents a provident decision by the tenant, free of coercion to warrant a judgment of ejectment. That is, it is not subject to enforcement on summary judgment without further inquiry.
Conclusion
This court supports the important goals of ADR in the resolution of interpersonal disputes that are not well handled within the court system. However, the case at bar typifies many of the problems recently identified by the Office of Court Administration Task Force on Processing Civilian Complaints by the New York City Criminal Court. The Task Force correctly recommended that procedures utilized by the various ADR centers throughout New York City, and presumably throughout the State, should be uniform (Findings & Recommendations, at 56-7 [1990]). The Task Force proposed increased use of a med-orb format in which arbitration is used as the final step to produce an enforceable decision. That proposal needs careful study before full implementation to insure that there is a legally sufficient written "plain language” consent by the parties both to the arbitration of the dispute and the specific procedures to be employed. Special care must be taken to see that mediator-arbitrators are properly trained to understand the special bodies of law applicable *1040 to agreements in special areas, such as landlord-tenant and matrimonial law. Reform of the procedural process at many ADR centers is required. As the instant case shows, ADR which is not procedurally well-grounded may only prolong litigation or void an appropriate agreement.
The motion is denied in all respects.

. The program was originally limited to "minor” cases. However, since 1986 certain felonies may be referred to ADR with the consent of the District Attorney, the victim and the defendant (Judiciary Law § 849-b [4] [f); L 1986, ch 837). Approximately 200 felony cases per year are referred to the ADR program (OCA Community Dispute Resolution Centers Program, Annual Report, Mar. 31,1990, at 36).

. The program was supported both as an aid toward resolving interpersonal disputes and because it would alleviate congestion in the courts so as to allow more time for the "more important” cases. Indeed, many supporters of ADR saw the conservation of limited court resources as the main rationale for the program (see, e.g., Letter of Police Benevolent Association; Letter of Member of the Assembly Kremer, the sponsor; Letters of Nassau and Onondaga County District Attorneys, Bill Jacket, L, 1981, ch 847).

. Accurate computations of the cost per disposition within the court system are unavailable. The Fund for Modern Courts performed a study in 1977/1978 of the costs in Bronx County Criminal Courts. That study found the weighted average cost of cases disposed of at arraignment was $390, while later dispositions cost $969 (Assn of Bar of City of NY, The Cost of Justice: An Analysis of Case Processing Costs in the Bronx Criminal Justice System, at 111-116 [1979]). Of course, these figures must be adjusted for inflation as well as changing court and police procedures.

. The court has received a copy of the "submission” form IMCR currently uses as its consent to arbitrate. The form does not unequivocally state that the parties consent to arbitrate and that they are aware that the aribitrator’s decision is final and binding. An ADR award may lead to judgments well in excess of $2,000 or to injunctions ultimately enforceable by contempt. Yet, the Small Claims Courts throughout the State, which heavily rely on arbitration, require a consent to arbitration which specifi *1038 cally acknowledges that the award is final, binding and nonappealable (see, 22 NYCRR 208.41 [n] [2]; 210.41 [m] [2]; 212.41 [m] [2]). The "final and binding” language is also required by Judiciary Law § 849-b (5) (e). Further, the IMCR form, which no doubt anticipates that there will be consented-to "awards” without a hearing, does not contain the waiver of the statutory procedure required by CPLR 7506 (f). Thus, even if the "submission” form had been signed here, the result would be the same.