203 P.3d 595 (2008)
GLN COMPLIANCE GROUP, INC., Plaintiff-Appellant,
v.
AVIATION MANUAL SOLUTIONS, LLC; RVSM Solutions, LLC; Misty D. McCumsey; J. Kent Hegwood, Jr.; and Jerry Hegwood, Defendants-Appellees.
No. 07CA1563.
Colorado Court of Appeals, Div. II.
October 16, 2008.
*596 Starrs Mihm & Caschette, LLP, Elizabeth A. Starrs, Daniel A. Wartell, Denver, Colorado, for Plaintiff-Appellant.
John C. Hugger, Evergreen, Colorado, for Defendants-Appellees Aviation Manual Solutions, LLC, and Misty D. McCumsey.
Silver & DeBoskey, P.C., Steven W. Kelly, Ruba M. Forno, Denver, Colorado, for Defendants-Appellees RVSM Solutions, LLC, J. Kent Hegwood, Jr., and Jerry Hegwood.
Opinion by Judge BERNARD.
Plaintiff, GLN Compliance Group, Inc., appeals the judgment of the trial court enforcing a settlement agreement between GLN and defendants, Aviation Manual Solutions, LLC, RVSM Solutions, LLC, Misty D. McCumsey, J. Kent Hegwood, and Jerry Hegwood. We reverse and remand for further proceedings.

I. Background
In April 2006, GLN sued defendants for allegedly misappropriating its trade secrets and other confidential and proprietary information. The trial court ordered the parties *597 to participate in alternative dispute resolution.
A mediation session was held in August 2006 before a retired judge who served as the mediator. After mediation discussions, the mediator asked the parties to make a record before a court reporter. The mediator began these proceedings by stating:
The record should reflect that the parties have previously sent me confidential settlement manuals and the like which I have reviewed, and I also spent a fair amount of time individually meeting with the parties here today in order to effectuate a settlement.
It's my understanding that we have one.... The record is for the purpose of getting this agreement on the record. A formal record will be prepared by counsel and then submitted and sent around for signatures and the like.
The attorneys for the parties then presented a summary of the agreement they had reached. At the conclusion of their presentation, the mediator asked the parties a series of questions designed to ensure that they understood the mediation agreement, that they had enough time to discuss it with their counsel, that no one had forced them to agree to it, and that GLN was "comfortable" with the mediation agreement.
At the end of the recorded session, the mediator engaged in the following exchange with one of the attorneys:
Mediator: [W]e have an agreement here, and counsel, you're going to be preparing this document and get it ready and send it around for signatures and the like?
Defendants' Attorney: I will circulate a draft as soon as I can get one prepared.
Mediator: Sure....
Shortly thereafter, defendants performed several of the obligations required by the mediation agreement, including sending GLN a settlement payment in the form of a check. One of the terms of the mediation agreement was that the check would be sent to GLN promptly after the mediation session, but that GLN would not negotiate the check until a written mediation agreement was signed. GLN negotiated the check before any agreement was signed.
In late September, there was the following exchange of e-mails between one of defendants' attorneys and GLN's mediation attorney concerning the written mediation agreement.
GLN's Mediation Attorney: Please send me an [electronic] version of the proposed settlement agreement so that [I may] make some proposed changes.
Defendants' Attorney: Here it is. (I understood from yesterday's e-mail that the form was approved with the one change to the attorneys' fees provision?)
GLN's Mediation Attorney: Oh, yeah. Thanks.
GLN's Mediation Attorney: The primary concern is to make it clear that GLN may seek to protect its proprietary information if your ... clients use such information in the future and may not transfer or convey any such information to third parties with impunity. That was my take.... It might be advisable to tone down the statement of the counterclaims against GLN, and I will attempt to do so.
GLN refused to sign the written mediation agreement. On the same day, without consulting its mediation attorney, GLN's president sent defendants' attorney a long letter, which contained profane and insulting passages. It began:
I reviewed the agreement you drafted for signature in regards the mediation.... What were YOU smoking? I am both disappointed and [outraged] at your conduct and the slanderous language used.
So [let's] cut to the chase. That will not be signed. Period. While you may have thought it [clever] to see how much you can screw you own clients over ... all you have done is succeeded in ensuring them a fast track to more civil and criminal issues, all of which I ... will continue to pursue regardless of your babbling and [the] diatribe you sent.
In October, GLN's mediation attorney moved to withdraw as GLN's counsel, citing irreconcilable differences with his client. GLN filed a written objection, in which it *598 stated that the case had reached a critical stage and the withdrawal of counsel could damage the parties' interests. GLN wrote, "A mediation session, which we thought was successful, was rendered unmanageable by opposing counsel and has been brought to a close." The court allowed GLN's mediation attorney to withdraw, and a new attorney entered his appearance for GLN.
Defendants filed a "Joint Motion to Enforce Settlement Agreement." The trial court held a hearing on the motion, at which GLN's president testified, and GLN's mediation attorney testified over GLN's objection. Among other arguments, GLN submitted that the mediation attorney's testimony was barred because the agreement reached at the mediation session had not been reduced to writing and signed by the parties, and because communications occurring at mediation sessions are "supposed to be confidential."
Defendants contended that GLN expressly agreed to the mediation agreement at the end of the mediation session, and this agreement was reflected by GLN's conduct afterward in accepting defendants' performance of elements of the mediation agreement. GLN responded that it did not agree to the written mediation agreement because it did not provide sufficient future protection for GLN's confidential information.
The trial court made findings of fact, including that GLN's mediation attorney had informed defendants' counsel that GLN had accepted the written mediation agreement; and that the sworn testimony of GLN's president at the hearing was not credible, and thus it was "not believed by the Court." The court then granted the motion to enforce the mediation agreement, concluding:
The [on-the-record] reading of the settlement agreement, together with the transcript, meets any requirement for a written document approved and accepted by the parties.
The trial court later ordered GLN to pay defendants' attorney fees under section 13-17-102, C.R.S.2008, because it found that its actions were vexatious.

II. The Mediation Privilege Created by Colorado's Dispute Resolution Act
GLN contends that the trial court's decision to enforce the settlement agreement was erroneous because the agreement was neither reduced to writing, nor signed by the parties, in violation of Colorado's Dispute Resolution Act (the Act). We agree.

A. General Principles
We review de novo a trial court's interpretation of a statute because it raises a question of law. When interpreting a statute, we look first to its plain language. We interpret its terms consistently with their common meanings. K & S Corp. v. Greeley Liquor Licensing Authority, 183 P.3d 710, 713 (Colo.App.2008).
Our duty is to interpret statutes in a manner that gives effect to the legislature's intent, and we will not pursue a statutory construction that would lead to an unreasonable or absurd conclusion. Interpretations that conflict with obvious legislative intent must be eschewed. We must, if possible, interpret a statute to give all its parts "consistent and sensible effect." Richmond American Homes of Colorado, Inc. v. Steel Floors, LLC, 187 P.3d 1199, 1204 (Colo.App. 2008).

B. The Act's Provisions
The Act, sections 13-22-301 to -313, C.R.S.2008, "governs the use of mediation as an alternative to litigation." Nat'l Union Fire Ins. Co. v. Price, 78 P.3d 1138, 1140 (Colo.App.2003). "The Act applies to all mediation services or dispute resolution programs conducted in the state, including those conducted by a private mediator." Id.
Discussions in mediation sessions are confidential. Under section 13-22-307(2) & (3), C.R.S.2008 (section 307(2) and (3)):
(2) Any party or the mediator ... in a mediation service proceeding or a dispute resolution proceeding shall not voluntarily disclose or through discovery or compulsory process be required to disclose any information concerning any mediation communication or any communication provided in confidence to the mediator....

*599 (3) Any mediation communication that is disclosed in violation of this section shall not be admitted into evidence in any judicial or administrative proceeding.
A "mediation communication" is defined by section 13-22-302(2.5), C.R.S.2008 (section 302(2.5)), to be:
[A]ny oral or written communication prepared or expressed for the purposes of, in the course of, or pursuant to, any mediation services proceeding or dispute resolution program proceeding, including, but not limited to, any memoranda, notes, records, or work product of a mediator, mediation organization, or party; except that a written agreement to enter into a mediation service proceeding or dispute resolution proceeding, or a final written agreement reached as a result of a mediation service proceeding or dispute resolution proceeding, which has been fully executed, is not a mediation communication unless otherwise agreed upon by the parties.

(Emphasis supplied.)

C. Scope of the Mediation Privilege
"The Act creates a mediation privilege against compelled testimony and discovery. The mediation privilege rests with the parties to the mediation and the mediator." Patrick F. Kenney, The Mediation Privilege, 29 Colo. Law. 65, 65 (Nov.2000) (footnote omitted); accord Jay M. Zitter, Annotation, Construction and Application of State Mediation Privilege, 32 A.L.R.6th 285 (2008).
The reason for such confidentiality, in the context of a pre-appellate argument conference, was discussed in Lake Utopia Paper Ltd. v. Connelly Containers, Inc., 608 F.2d 928, 930 (2d Cir.1979);
It is essential to the proper functioning ... that all matters discussed at these conferences remain confidential. The guarantee of confidentiality permits and encourages counsel to discuss matters in an uninhibited fashion often leading to []settlement.... If participants cannot rely on the confidential treatment of everything that transpires during these sessions then counsel of necessity will feel constrained to conduct themselves in a cautious, tight-lipped, non-committal manner more suitable to poker players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute. This atmosphere if allowed to exist would surely destroy the effectiveness of a program which has led to settlements....
(Citation omitted.)
An exception to the mediation privilege is found in section 13-22-308(1), C.R.S.2008 (section 308(1)), which states:
If the parties involved in a dispute reach a full or partial agreement, the agreement upon request of the parties shall be reduced to writing and approved by the parties and their attorneys, if any. If reduced to writing and signed by the parties, the agreement may be presented to the court by any party or their attorneys, if any, as a stipulation and, if approved by the court, shall be enforceable as an order of the court.

(Emphasis added.)
The foregoing sections of the Act were interpreted in National Union Fire Insurance Co., 78 P.3d at 1140-42. There, a trial court determined that the parties had reached a final oral settlement at a mediation session, that the mediator could be required to testify about the agreement, and that the agreement was enforceable by the court presiding over the civil case. A division of this court reversed, concluding that the mediation privilege barred evidence of the oral agreement reached during the mediation session. The division reached this conclusion by reading sections 302(2.5), 307(2), and 308(1) together:
[T]hese sections express the legislature's intent to create a blanket prohibition against disclosing mediation communication, whether or not the communication concerns a settlement, unless the parties consent or an exception applies. Taking into consideration the bar against admitting mediation communication into evidence, it is logical, therefore, that the existence and terms of a settlement agreement could not be proved without a signed writing that reflects those terms.

Nat'l Union Fire Ins. Co., 78 P.3d at 1141 (emphasis added).
*600 Thus, the only way for a party to obtain a court's enforcement of a settlement agreement obtained in the course of mediation is to follow the requirements of section 308(1). To accomplish this result, six steps must be followed: (1) the parties must reach a partial or complete agreement; (2) the parties must agree to reduce the agreement to writing; (3) the parties must approve the writing; (4) the parties must sign the writing; (5) the parties must present the signed writing to the court; and (6) the court must approve it as an order of court. Id. at 1140; see Reese v. Tingey Construction, 177 P.3d 605, 610 (Utah 2008)("[The requirement of a writing] encourages parties to prepare a comprehensive, final settlement agreement free from misunderstandings and ambiguities.... Requiring a writing also permits parties to `ferret out' areas where additional clarification is necessary.").

D. Application of the Principles
Here, the parties dispute whether the first three factors discussed in National Union Fire Insurance Co. were present. Defendants contend that the record made before the mediator constituted an agreement, which was reduced to writing via its inclusion in a transcript, and which was approved by GLN's response to the mediator's questions concerning acceptance of it. They further argue that, assuming the transcript did not constitute a settlement agreement, GLN, as represented in the exchange of e-mails, agreed to the contents of the written agreement subsequently drafted by one of defendants' attorneys.
GLN counters that the record before the mediator was merely an outline of terms, which was subsequently to be reduced to a written document that the parties could examine. GLN also contends that, as represented by the various communications after the mediation session, it did not agree to the proposed written agreement.
We conclude that the transcript from the mediation session, the written draft of the settlement agreement, and the testimony of GLN's mediation attorney about the settlement agreement qualify as mediation communications under section 302(2.5). They were oral or written communications prepared or expressed for the purposes of a mediation proceeding, and they were not "a final written agreement ... which has been fully executed," as required by section 302(2.5). Thus, the introduction of this evidence violated the mediation privilege contained in section 307(2) and (3). See James F. Carr, Patrick Kenney, Cynthia Savage & Peter D. Willis, The Uniform Mediation Act: Its Potential Impact on Colorado Mediation Practice  Part II, 31 Colo. Law. 67, 70 (June 2002) (section 307(3) "provides that a disclosure in violation of the protection of the act does not permit a subsequent use of the mediation communication in a judicial or administrative proceeding").
Although (1) the record has factual support for the defendants' position concerning the first three factors of section 308(1), as interpreted by National Union Fire Insurance Co.; and (2) the trial court found that the testimony of GLN's president was not credible, indicating that there is little or no factual support for GLN's position concerning the first three factors, nothing in the record indicates that the final three requirements were satisfied. The parties did not sign a writing after the mediation session; they did not present a writing to the court; and they did not ask the court to approve a writing as an order of court.
Thus, following the analysis in National Union Fire Insurance Co., we conclude that there was no enforceable settlement agreement, because not all of the six conditions necessary for the trial court to enforce the settlement agreement under section 308(1) were satisfied. Further, defendants were unable to prove that a settlement agreement existed and what its terms were, because, under section 307(3), proof of the agreement was admitted contrary to the mediation privilege. See Nat'l Union Fire Ins. Co., 78 P.3d at 1141; Gordon v. Royal Caribbean Cruises Ltd., 641 So.2d 515, 517 (Fla.Dist.Ct.App. 1994) ("Since it is clear that the parties hereto did not effectuate a settlement agreement in accordance with [a Florida court rule concerning settlement agreements resulting from mediation], the confidentiality afforded to parties involved in mediation proceedings *601 must remain inviolate."); Ellen E. Deason, Enforcing Mediated Settlement Agreements: Contract Law Collides with Confidentiality, 35 U.C. Davis L.Rev. 33, 47 (Nov.2001) ("When there is no documented settlement, there is no exception to the privilege that would allow a party to prove the existence of an agreement.") (discussing Colorado's statutes and others similar to it).
Yaekle v. Andrews, 169 P.3d 196, 198-200 (Colo.App.2007) (cert. granted Oct. 9, 2007), does not dictate a different result. There, the parties executed a written and signed settlement agreement after a mediation session, which they followed with a revised settlement agreement, which was not signed. Relying on contract principles, the division concluded that the revised agreement was enforceable. In reaching the conclusion that the revised agreement satisfied section 308(1), the division observed:
[T]he parties' agreement was reduced to formal documents as required by the [first] settlement agreement.... [T]he parties and their attorneys approved the agreement through their conduct and representations to the trial court.
Id. at 200.
However, unlike in Yaekle, the settlement agreement here was not signed, and GLN never indicated to the trial court that a written agreement had been approved or requested the court's approval of the settlement agreement.

E. Implied Waiver
We are also not persuaded that GLN impliedly waived the mediation privilege because we conclude that the mediation privilege cannot be waived by implication.
Recently, the California Supreme Court interpreted a similar statute, and concluded that the mediation privilege could not be impliedly waived. Simmons v. Ghaderi, 44 Cal.4th 570, 586-88, 80 Cal.Rptr.3d 83, 187 P.3d 934, 944-46 (2008). There, the court concluded that, because the language of the statute required express waiver of the mediation privilege, permitting implied waiver would violate the legislature's intent.
[T]he clear language of the statutory scheme and other indications of legislative intent reflect that disallowing an implied waiver would not produce absurd consequences, but was rather an intended consequence. [California's mediation privilege] sweeps broadly and renders all communications and writings made during mediation inadmissible except as otherwise specified in the statutes. [A statutory exception to the mediation privilege] plainly states that mediation communications or writings may be admitted only on agreement of all participants. Such agreement must be express, not implied.

Id. at 587, 80 Cal.Rptr.3d 83, 187 P.3d at 945 (citation omitted) (emphasis in original); see People v. Snyder, 129 Misc.2d 137, 138-39, 492 N.Y.S.2d 890, 892 (N.Y.Sup.Ct.1985)("I find that even if the defendant can be found to have waived the confidentiality of the records pertaining to the mediation sessions in which he was involved, the statute, as drafted, permits no such waiver."); see also 1 Jay E. Grenning, Alternative Dispute Resolution appx. D (3d ed. 2007) (Uniform Mediation Act) ("[T]he mediation privilege does not permit waiver to be implied by conduct.").
Like the California statute construed in Simmons, the Act also "sweeps broadly," because section 307(2) and (3) render "any information concerning any mediation communication" inadmissible in judicial or administrative proceedings unless a statutory exception applies. The Act sets forth four exceptions to the mediation privilege in section 307(2)(a)-(d). Section 307(2)(a), the only exception arguably pertinent here, is like the exception discussed in Simmons, because it states that the mediation privilege does not bar the introduction of mediation communications if "[a]ll parties to the dispute resolution proceeding and the mediator consent in writing."
Thus, because of the similarities between the Act and the California statutes discussed in Simmons, we are persuaded by the reasoning employed in Simmons, and we apply it to this case. This reasoning leads us to conclude that section 307(2) indicates that our legislature intended that the only mechanism for waiving the mediation privilege *602 available in this case would be an express written statement complying with the requirements of section 307(2)(a). Thus, allowing implied waiver of the mediation privilege would be contrary to our legislature's intent.
Because the record here does not contain an express written statement that complies with section 307(2)(a), we conclude that a waiver of the mediation privilege did not occur. Further, because our result arises from construing the relevant statutes, the trial court's finding that GLN's president was not credible does not affect our analysis.

III. Conclusion
We conclude that (1) the transcript of the settlement agreement, the written draft of the settlement agreement, and the mediation attorney's testimony about the settlement agreement are "mediation communications" under section 302(2.5); (2) there was no enforceable settlement agreement because the parties did not comply with the requirements of section 308(1); (3) the mediation privilege created by section 307(2) and (3) barred the introduction of the transcript of the settlement agreement, the written draft of the settlement agreement, and the testimony of GLN's mediation attorney about the settlement agreement at the hearing held on the motion to enforce the settlement agreement; (4) without the evidence of those documents and that testimony, the record does not establish the existence or parameters of a settlement agreement; (5) the mediation privilege was not expressly waived because the requirements of section 307(2)(a) were not followed; and (6) the language and structure of the Act indicate that the mediation privilege cannot be waived by implication.
We therefore reverse the trial court's judgment enforcing the settlement agreement and, consequentially, we must also reverse the award of attorney fees to defendants and deny their request for attorney fees on appeal. Our result and rationale convince us that we need not address whether the trial court's decision to allow GLN's mediation attorney to testify at the hearing to enforce the settlement agreement violated the attorney-client privilege.
We recognize this result may seem inflexible, but our conclusion is driven by the structure and language of the Act, and by the nature of the mediation process. Mediation meetings are often informal and fast moving. It is, therefore, reasonably likely in complex matters that disagreements will arise after the conclusion of mediation meetings about the specific terms of an agreement. Reading the agreement into the record provides some formality, but it remains an oral agreement. Having the settlement reduced to a formal writing, which the parties and the mediator clearly contemplated here, focuses the parties on what the specific language should be and what terms should be included or excluded.
The General Assembly has been clear in the Act to emphasize that mediation meetings must be confidential, and that mediation agreements must be made stipulated judgments of the court before they can be enforced to resolve disputes. This confidentiality encourages candor during the meeting, and it precludes equitable enforcement of putative mediation agreements. The requirement that agreements be written and signed provides considerable assurance that the parties fully understand and agree with the agreement's terms.
The judgment is reversed and remanded to the trial court for further proceedings consistent with this opinion.
Judge ROY concurs.
Judge TAUBMAN dissents.
Judge TAUBMAN dissenting.
This case presents the question of whether a settlement agreement arrived at in mediation and read into the record in open court before a senior judge, who served as the mediator, is enforceable as a court order or is otherwise enforceable. Under the circumstances presented here, I conclude that it is. I disagree with the majority's interpretation of section 13-22-308(1), C.R.S.2008, as discussed in National Union Fire Insurance Co. v. Price, 78 P.3d 1138, 1141 (Colo.App. 2003). I further disagree with the majority's conclusion that a party may not waive impliedly the provisions of section 13-22-308(1) *603 when it states on the record "in open court" that it has reached an agreement, both sides implement significant provisions of that purported agreement, and then that party repudiates the agreement because it was not signed and in writing.

I. Background
As the majority states, this case involves a dispute between plaintiff, GLN Compliance Group, Inc. and defendants, Aviation Manual Solutions, LLC (AMS), RVSM Solutions, LLC, Misty D. McCumsey, J. Kent Hegwood, and Jerry Hegwood. In April 2006, GLN sued defendants for allegedly misappropriating its trade secrets and other confidential and proprietary information. After the trial court ordered the parties to participate in alternative dispute resolution, they engaged in a settlement conference in August 2006 with a retired judge serving as a mediator. Believing a settlement had been reached, the mediator summoned a court reporter. The parties' counsel and the mediator then read the settlement agreement into the record. At the conclusion, the mediator specifically asked GLN's president, Gerald Naekel, "On behalf of GLN, sir, are you comfortable with this arrangement here?" Naekel responded, "I am, your honor." The mediator asked Naekel further questions, and Naekel responded that he had not been threatened or coerced into settling and that he had had an opportunity to discuss the settlement with his counsel. The same questions were asked of the other parties, and they responded similarly. Thereafter, consistent with the oral settlement agreement, GLN accepted a settlement payment from AMS and RVSM performed many of its obligations.
In September, 2006 one of defendants' attorneys e-mailed a written draft of the settlement agreement to GLN's counsel. Although GLN's counsel responded that the written draft was acceptable, Naekel refused to sign it. GLN's counsel moved to withdraw, and defendants moved to enforce the settlement agreement.
Following a hearing in May 2006, the trial court entered an order granting defendants' motion to enforce the settlement agreement that had been read in the presence of the senior judge and transcribed by a court reporter, a process the trial court described as reading "the settlement agreement into the record in open court." For convenience, I use the trial court's terminology, including the phrase "settlement agreement" rather than "mediation agreement." The trial court's extensive findings of fact included the following:
1. At the August 7, 2006 settlement conference, "the parties reached a settlement of all pending claims and actions." That settlement was read into the record in open court, and the parties agreed to execute a separate formal settlement document memorializing the terms of the parties' agreement and to file in the trial court a stipulation for dismissal of the claims with prejudice.
2. Naekel, GLN's representative, confirmed GLN's acceptance of the settlement terms, and asserted that he had not been threatened or coerced and that he had had ample opportunity to discuss the settlement terms with GLN's counsel.
3. On August 16, 2006, Naekel e-mailed defendant Kent Hegwood, stating GLN's intent to enforce the terms of the settlement agreement based upon Naekel's belief that RVSM had violated its terms.
4. On August 17, 2006, GLN's then attorney e-mailed RVSM's counsel asserting, on GLN's behalf, that RVSM may have violated the terms of the settlement agreement. The e-mail further stated that GLN intended to take legal action to enforce the terms of the settlement agreement.
5. On August 28, 2006, GLN negotiated the settlement payment tendered to it by defendant AMS. Although the settlement agreement read into the record in open court provided that GLN would not negotiate the check until the settlement agreement was finalized, the check was negotiated by GLN. Not until GLN filed its response to defendants' joint motion to enforce settlement agreement did GLN attempt to refund the settlement check to AMS, and, when it did so, AMS refused the refund.
6. On September 6, 2006, RVSM's counsel transmitted the formal written agreement *604 to GLN's counsel, and such tendered written agreement conformed to the terms of the settlement agreement read into the record in open court on August 7, 2006.
7. On September 25, 2006, GLN's counsel advised RVSM's counsel that the formal written agreement had been approved. GLN's counsel requested a one-word modification regarding attorney fees, but this change "was not material and was a change from the language approved on the record on August 7, 2006."
8. On September 27, 2006, GLN's counsel again e-mailed RVSM's counsel that GLN had accepted the formal written agreement.
9. On September 27, 2006, as well, Naekel sent an abusive and irrational letter to RVSM's counsel, stating in graphic terms that GLN would not comply with the terms of the settlement agreement and demanding numerous changes to it. These changes were not consistent with the agreement the parties had reached in open court. GLN had not objected to the settlement terms until Naekel sent this letter repudiating the settlement agreement.
10. Shortly after GLN's then attorney received a copy of Naekel's September 27 correspondence, he filed a motion to withdraw as counsel for GLN. The attorney testified that he filed the motion to withdraw after he advised GLN that his ethical obligations would compel him to file the motion unless the settlement agreement were signed.
11. Naekel's sworn testimony at the hearing was not credible and was not believed by the court. The court found the transcript did not support Naekel's claims that he could not hear the terms of the settlement agreement as it was read into the record, that he told GLN's then attorney that he could not hear the terms, and that he had further told the attorney that he had asserted numerous objections to the settlement terms. The court found that Naekel's assertions "were directly contradicted" by GLN's then attorney and the transcript. In addition, the court found:
Naekel's testimony regarding the portion[s] of the August 7, 2006 transcript which are noted to be "inaudible" was not credible and was materially false. The context of the "inaudible" notations contradict Mr. Naekel's claim that he was stating objections to the terms of the settlement agreement at those places in the transcript.
12. The court specifically found that had GLN's attorney remained as counsel and attempted to elicit the testimony which Naekel proffered at the hearing, the lawyer "would have run the risk of suborning perjury because [the lawyer] knew that Mr. Naekel's testimony was materially false."
13. The court found beyond any reasonable doubt that the transcript of the settlement read in open court "accurately reflects the terms of the settlement approved on the record by Mr. Naekel and GLN. The formal written agreement subsequently prepared and submitted to GLN conforms to the terms of the settlement agreement and accurately memorializes the settlement agreement between the parties."
14. Naekel's and GLN's statements and conduct following the August 7, 2006 settlement established GLN's acceptance of the settlement terms. The exhibits and testimony establish that GLN's counsel specifically communicated to RVSM's counsel that GLN approved and accepted the written settlement agreement. Further, GLN not only accepted the payment from AMS, but it also accepted performance by RVSM of numerous of its obligations under the settlement agreement, particularly the transmittal of RVSM manuals to GLN.
In a June 26, 2007 order awarding defendants attorney fees, the trial court further concluded:
GLN and Mr. Naekel's actions in repudiating the settlement agreement were factually groundless and vexatious. GLN and Mr. Naekel's actions were expressly taken for purposes of harassment. Moreover, Mr. Naekel's testimony on May 7, 2007 was false and was contradicted by the August 7, 2006 transcript. In addition, Mr. Naekel's September 27, 2006 letter establishes that he and GLN acted in bad faith, with the intent to annoy or harass defendants by conduct that was arbitrary, abusive, *605 stubbornly litigious, and disrespectful of truth.
It bears noting that the e-mail referred to by the majority which quoted GLN's attorney as expressing concern about GLN's protecting its proprietary information was not presented during the hearing. Rather, it was presented to the court in a motion to reconsider, which the court denied on July 25, 2007 "for the same reason stated on the record previously by the court and the reason stated in the response to the motion."

II. Scope of Colorado Dispute Resolution Act
Challenging the trial court's conclusion that there was an enforceable settlement, GLN relies on section 13-22-308(1) of the Colorado Dispute Resolution Act (Act). GLN also relies on the interpretation of that statute by a division of this court in National Union Fire Insurance Co. v. Price, 78 P.3d at 1140.
I believe that the interpretation of section 13-22-308(1) by the division in National Union is more narrow than is warranted by that provision's plain language. Rather, I agree with defendants that National Union's reasoning and validity are questionable, and that the case is factually distinguishable.
Section 13-22-308(1) states:
If the parties involved in a dispute reach a full or partial agreement, the agreement upon request of the parties shall be reduced to writing and approved by the parties and their attorneys, if any. If reduced to writing and signed by the parties, the agreement may be presented to the court by any party or their attorneys, if any, as a stipulation and, if approved by the court, shall be enforceable as an order of the court.
(Emphasis added.)
Thus, the first sentence of that provision requires that if the parties involved in a mediated dispute reach full or partial agreement, the agreement upon request of the parties must be reduced to writing and approved by the parties and their lawyers. Here, the parties reached a full agreement, as the trial court found, and because the senior judge conducting the mediation requested that it be reduced to writing and the parties agreed, the agreement should have been reduced to writing under the statute.
However, the second sentence of section 13-22-308(1) provides that if the settlement agreement is reduced to writing and signed by the parties, the agreement may be presented to the court as a stipulation and, if approved by the court, it will become enforceable as an order of the court. The term "if" is conditional. See, e.g., Points v. Points, 312 Ky. 348, 227 S.W.2d 913 (1950) ("if" is conditional term meaning "in the event" or "in case that"). Thus, the statute does not address what results follow when the parties have reached a full agreement and it is not reduced to writing and signed by the parties.
Significantly, the plain language of section 13-22-308(1) does not preclude an agreement reached under the Dispute Resolution Act from being judicially enforceable, even if it is not otherwise enforceable as an order of the court.
In my view, the division in National Union erred by ignoring the plain meaning of the word "if," and in concluding that the second sentence of section 13-22-308(1) merely provided additional prerequisites to the existence of a court-approved settlement agreement.
Further, the division in National Union concluded:
The legislature chose to describe only one method for obtaining a court order, and we assume the omission of any other methods was intentional. Using the standard rule of statutory construction that the inclusion of one is the exclusion of others, we conclude that section 13-22-308(1) describes the only method for obtaining court enforcement of a mediated settlement agreement. As such, court enforcement of an oral settlement agreement is necessarily barred.
Nat'l Union Fire Ins., 78 P.3d at 1141 (citation omitted).
Because it did not address the meaning of the word "if," the National Union division did not consider that the General Assembly intended that mediated oral settlements *606 could be enforced under certain circumstances not specified in the statute.
My interpretation is consistent with the General Assembly's intent to honor the confidentiality of mediation discussions in order to promote mediated settlements. Thus, when parties to a mediated settlement follow the express requirements of section 13-22-308(1), they will be assured that the settlement agreement will be enforced as an order of the court. However, the converse of that proposition is not necessarily true, particularly in the circumstances presented here, as discussed below.
In addition, I believe that National Union is factually distinguishable. There, the issue was whether a party had orally accepted an alleged settlement agreement during the mediation that was not later read into the record. Thus, the testimony of the mediator was necessary to prove the existence of the agreement. I agree that in such circumstances, the General Assembly's goal of strengthening the confidentiality attendant to the mediation process required that disclosure of such mediation communication was improper. Here, in contrast, all parties agreed on the record that they had reached an agreement, and thus, whether an agreement had been reached was not at issue.

III. Waiver of Provisions of Section 13-22-308(1)
Even if I were to agree with the broad interpretation of section 13-22-308(1) in National Union, I disagree strenuously with GLN's contention that the provisions of that statute may not be impliedly waived by the parties.
Ordinarily, the issue of waiver is a matter for factual determination by the trial court. Vessels Oil & Gas Co. v. Coastal Refining & Mktg., Inc., 764 P.2d 391, 392 (Colo.App. 1988). However, where "the facts are uncontested and the evidence before the trial court is entirely documentary, the waiver issue becomes a matter of law." Id.
Waiver is the intentional relinquishment of a known right. Vanderbeek v. Vernon Corp., 25 P.3d 1242, 1248 (Colo.App.2000), aff'd, 50 P.3d 866 (Colo.2002). "Waiver may be express, as when a party states its intent to abandon an existing right, or implied, as when a party engages in conduct which manifests an intent to relinquish the right or acts inconsistently with its assertion." In re Marriage of Hill, 166 P.3d 269, 273 (Colo. App.2007).
Both constitutional and statutory rights may be waived. For example, in People v. Harrington, 179 Colo. 312, 315, 500 P.2d 360, 361 (1972), the Colorado Supreme Court held that a defendant in a criminal case may understandingly and voluntarily waive his or her constitutional rights to the assistance of counsel, confrontation of witnesses, and trial by jury. Similarly, in the civil context, the Colorado Supreme Court held:
[A] person may effectively by acts or omission waive a constitutional right to the protection of which he would otherwise be entitled, provided the waiver does not run counter to public policy or public morals. This is nothing more than the equitable doctrine of estoppel applied in the realm of constitutional law and is uniformly upheld in cases where the constitutional provision is solely protective of property rights.
Fifth Church of Christ, Scientist v. W.F. Pigg & Son, Inc., 109 Colo. 103, 106, 122 P.2d 887, 888 (1942) (quoting Wilson v. Sch. Dist., 328 Pa. 225, 195 A. 90, 100 (1937)).
Further, a statutory right may be waived if such waiver is made freely and voluntarily. People v. Wiedemer, 852 P.2d 424, 438 (Colo. 1993); People v. Bottenfield, 159 P.3d 643, 645 (Colo.App.2006).
I agree with defendants that, even if a written agreement is required by the Act, "GLN's actions ratifying both the terms of the post-settlement conference agreement and its e-mail approval of the written agreement" warrant enforcement of the settlement agreement. See Gulick v. A. Robert Strawn & Assocs., Inc., 477 P.2d 489, 491 (Colo.App. 1970) (not published under C.A.R. 35(f)) (acceptance of benefit under a contract constitutes ratification equally with written confirmation); see also Board of County Comm'rs v. DeLozier, 917 P.2d 714, 716 (Colo.1996) (doctrine of promissory estoppel is "a modest extension of the basic contract principle that one who makes promises must be required to *607 keep them;" it provides a remedy to those who rely to their detriment upon promises which the promisor should have reasonably expected to induce such reliance). Although defendants do not specifically use the term "waiver," the substance of their argument is that, through its conduct, GLN waived its statutory right to have a written settlement agreement enforced as a court order. See Grohn v. Sisters of Charity Health Servs. Colo., 960 P.2d 722, 727 (Colo.App.1998) (citing Hutchinson v. Hutchinson, 149 Colo. 38, 367 P.2d 594 (1961), for the proposition that the "substance of [the] claim rather than the appellation controls").
Here, although the trial court did not explicitly state that GLN's conduct constituted an implied waiver of its statutory right to have the settlement agreement in writing, the court concluded that "Mr. Naekel's and GLN's statements and conduct following the August 7, 2006 settlement establish [GLN's] acceptance of the settlement." The court found:
Among other things, the exhibits and testimony established the written settlement agreement.... GLN not only accepted the payment from AMS, but it accepted performance by RVSM of numerous of its obligations under the settlement agreement, particularly the transmittal of RVSM manuals to GLN as set forth in page 4 of the transcript and paragraph 3 of the formal written agreement.
The trial court further found that, "[o]n August 16, 2006, Mr. Naekel sent an e-mail to Mr. Kent Hegwood, stating GLN's intention to seek enforcement of the terms of the settlement agreement based upon Mr. Naekel's belief that RVSM had violated the terms of the settlement agreement," and "[o]n August 17, 2006, [GLN's former counsel] sent an e-mail to RVSM's counsel asserting, on GLN's behalf," "GLN's intention to take legal action enforcing the terms of the settlement agreement."
These findings are based on undisputed evidence in the record, and warrant the conclusion that GLN's conduct was inconsistent with its later assertion that the oral settlement agreement was unenforceable. Consequently, I conclude that GLN's conduct constituted an implied waiver of its statutory right to have the settlement agreement in writing.
I also conclude that there was an implicit waiver by the parties of any requirement under section 13-22-307(3), C.R.S.2008, that would otherwise have prohibited receipt into evidence of the transcript of the settlement agreement before the senior judge or testimony about it. At the court hearing to enforce the settlement agreement, GLN did not object to the introduction of testimony by its former lawyer, or to the introduction of the transcript of the settlement agreement, as prohibited mediation communications. Further, when the senior judge requested that the parties put their agreement on the record before him in open court, GLN did not then object that an on-the-record recitation of the parties' settlement was a prohibited mediation communication which could not be revealed to the court.
Further, despite the broad language in National Union regarding the requirement for a written agreement under the Act, the division in that case did not address whether a party could waive the provisions of that statute.
If a party may waive a constitutional right, which is indisputably more significant than a statutory right, it seems inconceivable to conclude that a party may not waive the statutory requirements under the Dispute Resolution Act.
Instead, the conclusion that statutory waiver is warranted here is especially appropriate given that the parties began implementing the terms of the settlement agreement and that GLN even threatened RVSM with litigation for its perceived failure to comply with the provisions of that agreement.
The circumstances here are analogous to the familiar doctrine under the statute of frauds, see § 38-10-108, C.R.S.2008, that part performance may take the place of a writing and permit enforcement of an otherwise unenforceable oral contract. See Ralston Oil & Gas Co. v. July Corp., 719 P.2d 334, 339 (Colo.App.1985).
In contrast, the credit agreement statute of frauds expressly bars all claims relating to *608 a credit agreement unless the credit agreement is in writing. Section 38-10-124(3), C.R.S.2008, expressly prohibits implication of a credit agreement under any circumstances, including by partial performance by or on behalf of a creditor or debtor or by promissory estoppel. See Lang v. Bank of Durango, 78 P.3d 1121, 1123 (Colo.App.2003).
Accordingly, if the General Assembly had intended to exclude part performance from the circumstances that would demonstrate a waiver of the Act's requirements for a written settlement agreement, it could have done so expressly as it did in the credit agreement statute of frauds.
This result is consistent with Yaekle v. Andrews, 169 P.3d 196, 198-200 (Colo.App. 2007) (cert. granted Oct. 9, 2007), where a division of this court concluded that a revised settlement agreement was enforceable, even though it was not set forth in writing as required by section 13-22-308(1). Indeed, the Yaekle division concluded that the revised settlement agreement was enforceable in part based upon the parties' conduct and representations to the trial court. Similar circumstances here warrant the enforcement of the settlement agreement as read into the record in court.
Further, neither Simmons v. Ghaderi, 44 Cal.4th 570, 80 Cal.Rptr.3d 83, 187 P.3d 934 (2008), nor People v. Snyder, 129 Misc.2d 137, 492 N.Y.S.2d 890 (N.Y.Sup.Ct.1985), relied on by the majority, is to the contrary. There, the courts prohibited disclosure of statements made during the actual mediation discussions. In contrast, here, the question is not the confidentiality of statements made during mediation settlement discussions, but rather whether the statute allows them to place on record before a mediator the terms of the agreement they had reached. Neither Simmons nor Snyder addressed circumstances where the parties had partially implemented an oral settlement agreement; therefore, their discussions of the limitations of statutory waiver are inapposite here.
My conclusion that section 13-22-308(1) does not bar enforcement of the settlement agreement here is supported by the decisions of other courts. See Few v. Hammack Enters., Inc., 132 N.C.App. 291, 296, 511 S.E.2d 665, 669 (1999) (enforcing oral settlement agreement reached during mediation); Kaiser Found. Health Plan v. Doe, 136 Or.App. 566, 571-72, 903 P.2d 375, 378 (1995) (same), modified, 138 Or.App. 428, 908 P.2d 850 (1996); Reese v. Tingey Constr., 177 P.3d 605, 608 (Utah 2008) (while declining to enforce oral agreement, court noted that in circumstances of duress, fraud, or another credible contract defense, the interests of justice may outweigh the parties' need for confidentiality in determining whether a settlement agreement was reached).

IV. Attorney Fees
Based upon my analysis, I would also reject GLN's contention that the trial court abused its discretion in awarding attorney fees to defendants.
Here, the trial court awarded attorney fees against Naekel and GLN on the basis they acted in bad faith, with the intent to annoy or harass defendants by conduct that was arbitrary, abusive, stubbornly litigious, and disrespectful of the truth. The court further concluded that the actions of both GLN and Naekel in repudiating the settlement agreement were factually groundless and vexatious. Accordingly, I would conclude that the record supports these findings and warrants affirmance of the trial court's award of attorney fees.
However, I would not award defendants attorney fees on appeal. See Front Range Home Enhancements, Inc. v. Stowell, 172 P.3d 973, 977 (Colo.App.2007) (appellate attorney fees are awardable under section 13-17-102, C.R.S.2008, only if the appeal itself is frivolous).
In conclusion, I agree with the trial court that GLN and Naekel engaged in egregious conduct by (1) agreeing to read the terms of their settlement on the record before the senior judge who served as mediator, (2) implementing significant provisions of that agreement, (3) allowing the introduction of the transcript of the settlement hearing before the trial court without objection, and (4) only thereafter asserting that the disclosure of these asserted mediation communications was barred by the provisions of the Act.
*609 While the Act appropriately encourages that mediation communications be confidential and that settlements resulting from mediation be in writing and signed by the parties, not allowing waiver of the statutory provisions under any circumstances will simply encourage litigiousness and discourage settlement, contrary to the very purposes of the Act.
Accordingly, I respectfully dissent.