Argued and submitted May 26, reversed and remanded with instructions
September 13, motions for reconsideration filed September 25 and September 28
allowed by opinion January 3, 1996
See 138 Or App 428, 908 P2d 850 (1996)

# KAISER FOUNDATION HEALTH PLAN OF THE NORTHWEST,
an Oregon nonprofit corporation,
*Appellant,*

*v.*

## Jane DOE,
*Respondent.*

### (9309-05955; CA A85958)

903 P2d 375

E. Joseph Dean argued the cause for appellant. With him on the briefs were Christine Kitchel, John V. Acosta and Stoel Rives Boley Jones & Grey.

Kathryn H. Clarke argued the cause for respondent. With her on the brief were Stephen F. Crew, Gary Firestone and O'Donnell Ramis Crew Corrigan & Bachrach.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

## EDMONDS, J.

Plaintiff appeals a judgment for defendant on a claim that sought a declaration that the parties had entered into an enforceable oral settlement agreement and specific enforcement of the same. ORS 28.010 *et seq*. Plaintiff argues that the court erred in holding that the agreement was not binding. We review *de novo*, ORS 19.125(3), and reverse.

Defendant is a nurse who was employed with plaintiff for several years. In 1993, she notified Myrna Baker, the Director of Human Resources for plaintiff, that she had been sexually harassed by one of plaintiff's doctors, "Smith."[1] Defendant thereafter filed a grievance with her union and a complaint with the Bureau of Labor and Industries (BOLI) against Smith, plaintiff, and plaintiff's local affiliate.

One of plaintiff's attorneys, Eileen Drake, contacted defendant's attorney, Henry Kaplan, regarding the allegations and the possibility of settlement. Ultimately, defendant agreed to mediate her complaints with a private mediator. On the morning of August 18, 1993, the parties began a mediation conference that included the mediator, Baker, plaintiff's attorneys, defendant and her husband, Kaplan, and Smith's attorney. The mediator placed the parties in separate rooms and contacted each party separately during the mediation process. During that time, defendant and her husband had no contact with anyone except the mediator and Kaplan. At midday, the parties' attorneys met with the mediator for lunch to discuss the case. Plaintiff's attorneys apprised Kaplan of some evidence that they had discovered regarding defendant's conduct at work and explained that defendant would possibly be subject to disciplinary procedures, should she continue to work for plaintiff. After lunch, Kaplan shared this information with defendant. Late in the day, the attorneys, after meeting with the mediator, arrived at a proposed agreement, which Kaplan urged defendant to accept. The terms of the proposal included a cash payment from plaintiff in exchange for defendant's agreement to resign voluntarily from plaintiff's employment. Defendant wanted a few days to think about the proposal, because she had anticipated a

---

[1] Plaintiff has chosen not to use the real names of some of the parties involved in order to maintain confidentiality.

settlement that would permit her to retain her job. However, plaintiff's attorneys said that the offer would be withdrawn if it was not accepted on that day. Thereafter, defendant authorized Kaplan to 'accept the terms of the offer, but instructed him to wait a few hours before notifying plaintiff of the acceptance.

Thereupon, defendant and her husband left for dinner, and Kaplan returned to the mediation site where all the attorneys signed a document to confirm the terms they had agreed constituted the offer. The document read:

"Essential Terms of Agreement

"[Plaintiff], [plaintiff's local affiliate], and [Smith] will pay [defendant] the sum of $65,000

"[Defendant] will voluntarily resign effective immediately

"[Defendant] will not reapply to [plaintiff] or [plaintiff's local affiliate] for employment in the future

"The settlement agreement will include a mutual confidentiality clause

"[Defendant] may say 'the parties have resolved their differences,' 'I have reached a mutually acceptable basis for voluntarily quitting,' 'I've decided to move to another position'

"The settlement agreement will include an arbitration provision

"[Plaintiff] will not challenge any rights [defendant] may have to unemployment benefits

"[Defendant] will receive the value of any accrued vacation

"[Defendant's] pension rights will not be affected

"[Defendant] will prepare and file any documents necessary to dismiss the BOLI claim, her workers' [compensation] claim and union grievance (all with prejudice)

"The settlement agreement will include and [sic] complete and full mutual release

"[Defendant] will be provided assistance with resume preparation and interview skills through Career Makers"

After the attorneys signed the document, Kaplan told plaintiff's attorneys that he would convact them within a few hours with either defendant's acceptance or rejection of

the proposed agreement. The attorneys agreed that if defendant accepted the terms, Christine Kitchel, one of plaintiff's attorneys, would draft a formal settlement agreement for all the parties to sign.

Later that evening, Kaplan contacted Kitchel to clarify the breadth of the confidentiality provision in the agreement. He testified at trial that he was concerned that the way they "had worded and discussed the confidentiality provision, [defendant] couldn't even talk about [the sexual harassment] to her psychotherapist * * *." Kitchel and Kaplan then agreed that the confidentiality provision would not prohibit defendant from discussing the case with her psychotherapist. Kaplan called Kitchel a second time to make certain that the money received in the settlement would be characterized by plaintiff for tax purposes as compensation for pain and suffering. After receiving a satisfactory answer from Kitchel, Kaplan told Kitchel that defendant had accepted the terms. He then notified the mediator that they had "settled the case." He also notified defendant either before or after his second call to Kitchel that he was about to accept, or had just accepted, the settlement terms on defendant's behalf.

Two days later, defendant notified Kaplan that she declined to settle her claims. On August 26, she sent a letter to Kaplan which stated:

"As of August 20, 1993, I rescinded on a verbal agreement with Kaiser which I made under extreme duress."

Meanwhile, on August 25, Kitchel had delivered to Kaplan a draft of a proposed written settlement. Kaplan notified Drake on August 30 that defendant did "not wish to enter into a settlement agreement along the lines we discussed at the mediation session on August 18." This lawsuit resulted.

Plaintiff's complaint alleges that the parties reached a valid and enforceable oral settlement agreement on August 18, 1993. It seeks a declaration to that effect, a judgment compelling arbitration or, in the alternative, specific performance, and an injunction enjoining defendant from pursuing any further claims arising from the incident with Smith. After a trial to the court, the court found that defendant had accepted the settlement through Kaplan, and that the terms were sufficiently definite to be enforceable. Nevertheless, it

ruled that the agreement was unenforceable because defendant had not signed a written agreement.[2]

◼      Plaintiff first assigns error to the court's ruling that a settlement agreement arising out of mediation must be in writing. As plaintiff points out, the court did not cite any authority in support of its holding. Defendant argues that, as a matter of law, agreements reached during mediation should be in writing, because that is "in accord with the expectations of the legal community," due to the confidential nature of mediation, and because most of the negotiation that takes place in mediation occurs between the lawyers and the mediator, without the parties being present. Furthermore, she argues that "it is clear that [these] parties did not intend to be bound" until they signed a written agreement. We can find no authority that supports the proposition that settlements reached during mediation should receive special treatment or be analyzed differently from settlements reached in other settings. Therefore, we disagree with the trial court's holding in that respect.

◼      Moreover, the issues raised by defendant are initially questions of fact about when the parties intended their agreement to become binding. In *Britt v. Thorsen*, 258 Or 135, 137, 481 P2d 352 (1971), the court faced a similar question of whether the parties intended an agreement to be effective immediately or only after the execution of a written agreement. The court explained:

" 'Where parties agree to reduce their agreement to writing, the question arises as to whether their negotiations constitute a contract. * * * [W]here all the substantial terms

---

[2] The trial court explained:

"The court holds in mediation only, an acceptance becomes irrevocable only after a party personally and physically agrees to and signs a written document.
"* * * * *

"The process of mediation is bottomed on the premise of voluntariness. The interested parties are present volitionally. A settlement, if one is ever reached, is completely voluntary. No party should be able to back the other into accepting an agreement

"Given this novel concept surrounding mediation, the [c]ourt does not believe that a standard contract law analysis is appropriate. Specifically, in the context of mediation, an acceptance of an offer does not occur and does not become binding until the offeree personally and physically signs or executes a written document."

of a contract have been agreed on and there is nothing left for future settlement, the fact alone that it was the understanding that the contract should be formally drawn up and put in writing does not leave the transaction incomplete and without binding force, in the absence of a positive agreement that it should not be binding until so reduced to writing and formally executed. Where, however, the writing is regarded as a prerequisite to the closing of the contract, the agreement does not become binding if there has been a failure to reduce it to writing.' " 258 Or at 137-38 (quoting *Gen. Realty Corp. v. Douglas Lowell, Inc.*, 223 Or 244, 253-54, 354 P2d 306 (1960)). (Citations omitted.)

The objective manifestations of the parties as evidenced by their communications and acts control the resolution of this issue. *Real Estate Loan Fund v. Hevner*, 76 Or App 349, 354, 709 P2d 727 (1985). The evidence indicates that the parties intended that the settlement become binding on the evening of August 18. Plaintiff's attorneys made it clear to Kaplan that defendant was required either to accept or to reject the proposed settlement that night even though she had requested several days within which to consider it. Defendant authorized Kaplan to accept the offer before she went to dinner, and Kaplan notified the mediator thereafter that they "had settled the case." Furthermore, Kitchel testified that the purpose of having the attorneys sign the written memorandum was to meet any statute of frauds requirements. Defendant's argument that her intent was not to be bound until she had signed a written settlement agreement is not supported by the evidence. Her actions objectively manifested an intent to be bound that night.

■    Nevertheless, defendant argues that she did not give Kaplan authority to enter into a final settlement with plaintiff on August 18, and that she was not even aware of some of the terms listed in the agreement. She argues:

"The mere fact of the attorney client relationship does not provide actual or apparent authority to settle. * * * [A]n attorney's authority to represent a person in negotiation does not provide actual or apparent authority for the attorney to settle. [Kaplan] had no actual authority to enter into a final settlement agreement, his only authority was to tell Kaiser to draft a written agreement."

A principal is bound by the acts of its agent when the acts are within the scope of the agent's real or apparent authority. *Roby's Enterprises v. Hanover Development Corp.*, 67 Or App 594, 599, 679 P2d 871 (1984). In this case, there is ample evidence from defendant's objective manifestations to indicate that she gave Kaplan actual[3] authority to accept the settlement offer, not just to tell plaintiff to draft a proposed agreement. *See also Kitzke v. Turnidge*, 209 Or 563, 573, 307 P2d 522 (1957) ("The law of contracts is not concerned with the parties' undisclosed intents and ideas."). Defendant told Kaplan to accept the offer, but to make plaintiff wait awhile.

■■    Furthermore, even if she was unaware of some of the terms in the offer, defendant had vested Kaplan with apparent authority to bind her. Apparent authority is created by conduct of the principal, which when reasonably interpreted causes a third party to believe that the principal has authorized the agent to act on the principal's behalf in the matter. *Jones v. Nunley*, 274 Or 591, 595, 547 P2d 616 (1976). In this case, the record shows that from the time Drake first contacted Kaplan, and especially during mediation, defendant permitted Kaplan to do all the negotiating regarding the case on her behalf, and in turn, he kept her apprised of his negotiations and made counteroffers on her behalf. The offer itself was conveyed to defendant through Kaplan, and defendant's and Kaplan's conduct indicated that an acceptance or rejection would be conveyed to plaintiff through Kaplan, which in fact happened. When Kaplan accepted the settlement, plaintiff had no reason to believe that he was not authorized to accept all of the terms. In sum, defendant's conduct was reasonably interpreted by plaintiff as having given Kaplan authorization to accept the entire offer.

Defendant also relies on our holding in *Johnson v. Tesky*, 57 Or App 133, 643 P2d 1344 (1982). In *Johnson*, the plaintiff authorized her attorney to conduct settlement negotiations, which continued for more than a year. The plaintiff eventually brought a claim against the defendant, and about

---

[3] Actual authority is either express or implied. Express authority is that authority that the principal confers upon the agent in express terms. The express authority to do a certain thing carries with it the implied authority to do those other things that are reasonably necessary to carry out the authorized task. *Wiggins v. Barrett & Associates, Inc.*, 295 Or 679, 686-87, 669 P2d 1132 (1983).

two weeks before the trial date, the defendant made a settlement offer to which the plaintiff's attorney said he believed the plaintiff would agree. However, the plaintiff refused to accept the offer. We held that the authority to negotiate with the opposing party does not by itself imply the authority to enter into a binding settlement. *Id.* at 136-37. In this case, defendant authorized more than just negotiations; when Kaplan conveyed the offer to her, she told him to accept it.

Defendant next argues that the parties never reached a meeting of the minds on some of the essential terms, in particular, the arbitration, confidentiality, and release provisions. Defendant first argues that she was not personally aware of the arbitration provision and, therefore, could not have agreed to it. The short answer to that argument is again that, at the very least, Kaplan had apparent authority to settle defendant's claim on her behalf, and Kaplan accepted the arbitration provision as part of the settlement. "It is well settled that the conduct of an attorney who acts within the scope of his or her authority will be imputed to the client." *MacDonald v. Cottle*, 133 Or App 35, 40, 889 P2d 1320, *rev den* 321 Or 268 (1995).

■        Next, defendant argues that the attorneys involved in the negotiations did not have a "meeting of the minds" as to those provisions, because they did not have the same understanding about the meanings of the provisions. As we have said, we determine issues of contractual intent by the objective manifestations of the parties. *Hevner*, 76 Or App at 354.

In *Booras v. Uyeda*, 295 Or 181, 666 P2d 791 (1983), the court said:

> "To be entitled to specific performance, a contract must be definite in all material respects, with nothing left for future negotiation. The foregoing is subject to an exception that '* * * [i]f there is sufficient intent expressed to make a legally valid contract, a court of equity can make certain by its decree, within limits, subordinate details of performance which the contract itself does not state.' " *Id.* at 191-92 (quoting *Howard v. Thomas* 270 Or 6, 13, 526 P2d 552 (1974)).

Likewise, *Corbin on Contracts* § 95 at 394 (1950), declares:

"A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract; they must have expressed their intentions in a manner that is capable of understanding. It is not even enough that they have actually agreed, if their expressions are * * * not such that the court can determine what the terms of that agreement are. Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, [may] prevent the creation of an enforceable contract."

■ We therefore look to the parties' objective manifestations to determine if the parties have sufficiently expressed the terms they agreed upon. Defendant argues that, as to the release, she and Kaplan understood that the release would cover only "the claims at issue in the mediation and no other claims." However, the evidence shows that Kitchel told Kaplan that she intended the release to cover all potential claims that defendant had against plaintiff, and that Kaplan replied that he was familiar with "those types of releases." We find that Kaplan, on behalf of defendant, manifested an objective acceptance to the kind of release contemplated by Kitchel.

■ Defendant also argues that the parties had differing understandings of what the confidentiality provision meant and, therefore, that term is not sufficiently definite. Again, it is clear from Kaplan's testimony that he understood that the confidentiality provision was inclusive, and in fact, he called Kitchel to modify the scope of the provision so as to permit defendant to discuss the subject matter of her claims with her therapist. The evidence also shows that the parties further agreed to modify the confidentiality clause by prohibiting defendant from mentioning Smith's name to her therapist. We conclude that the confidentiality clause is sufficiently definite to be enforceable.

■ As to the arbitration provision, defendant argues that they never agreed to the form or the scope of arbitration, nor did they agree whether the arbitration result would be binding or nonbinding. However, Kitchel testified:

"[T]he discussion arose actually following the discussion about confidentiality and we were talking about the fact that obviously confidentiality was an important aspect to everybody, to [defendant], to [Smith], to [plaintiff's local affiliate],

[plaintiff], so this was kind of a — confidentiality was a concept that everybody was interested in.

"And I said that — I suggested an arbitration provision, especially given the confidentiality, because we didn't want to end up in court litigating these issues when all the parties had agreed to keep them confidential, and I suggested an arbitration provision.

"* * * * *

"I suggested arbitration at that point, and [Kaplan], we chatted about it briefly. And [Kaplan] said, what do you have in mind.

"And I said, well, you know, we can make arbitration whatever way we want, and I said — I suggested we could use the Triple A process [rules of the American Arbitration Association] and I mentioned to him that I had heard about an employment arbitration process that Triple A had implemented.

"And [Kaplan] had not heard about it so we just said Triple A, kind of left it at that."

Kaplan testified that he did not remember discussing the American Arbitration Association (AAA) process with Kitchel, but he understood that the arbitration provision would cover only the confidentiality issue because everything else would be "self-executing * * *. There would be nothing left to arbitrate other than monitoring the confidentiality restriction." Kaplan's testimony is not necessarily inconsistent with Kitchel's understanding that the parties had agreed on an arbitration process and its scope.

Furthermore, there is ample evidence that both attorneys understood that the arbitration provision would be binding. Kitchel testified that she suggested arbitration "in lieu of litigation," and that the rules of AAA should apply. When considered in that context, we are convinced that the parties recognized that the confidentiality of their agreement would be preserved only through arbitration that was binding on both parties. In the light of that evidence and this state's policy to construe arbitration agreements broadly to enhance arbitrability of disputes, *Budget Rent-A-Car v. Todd Investment Co.*, 43 Or App 519, 524, 603 P2d 1199 (1979), we conclude that the parties agreed to incorporate by reference the rules of the American Arbitration Association into their

agreement and that that reference is sufficient and definite enough to make their agreement enforceable.

Defendant also argues that ORS 36.310[4] prohibits the enforcement of an oral agreement to arbitrate. Defendant is wrong. ORS 36.310 applies to written agreements to arbitrate disputes and provides for court-ordered arbitration. ORS 36.305.[5] In this case, there is no written contract, and therefore, ORS 36.310 is inapplicable. Furthermore, when statutes about arbitration do not apply, the common law of arbitration is still in place and, at common law, an oral agreement to arbitrate is usually enforceable. *See Halvorson-Mason Corp. v. Emerick Const. Co.*, 304 Or 407, 412, 745 P2d 1221 (1987). We conclude that nothing in ORS 36.310 prevents the parties from making an enforceable agreement to arbitrate outside the purview of the statute. We conclude that the parties intended to create a binding agreement on August

---

[4] ORS 36.310 provides:

"A party aggrieved by the failure, neglect or refusal of another to perform under a contract or submission providing for arbitration, described in ORS 36.305, shall petition the circuit court, or a judge thereof, for an order directing that the arbitration proceed in the manner provided for in the contract or submission. Ten days' notice in writing of the application shall be served upon the party in default, in the manner provided for personal service of a summons. The court or judge shall hear the parties, and if satisfied that the making of the contract or submission or the failure to comply therewith is not an issue, shall make an order directing the parties to proceed to arbitration in accordance with the terms of the contract or submission. If the making of the contract or submission or the default is an issue, the court or the judge shall proceed summarily to the trial thereof. If no jury trial is demanded by either party, the court or judge shall hear and determine such issue. Where such an issue is raised, any party may, on or before the return day of the notice of application, demand a jury trial of the issue, and if such demand is made, the court or judge shall make an order referring the issue to a jury in the manner provided by ORCP 51 D. If the jury finds that no written contract providing for arbitration was made or submission entered into, as the case may be, or that there is no default, the proceeding shall be dismissed. If the jury finds that a written contract providing for arbitration was made or submission was entered into and there is a default in the performance thereof, the court or judge shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof."

[5] ORS 36.305 provides:

"A provision in any written contract to settle by arbitration a controversy thereafter arising out of such contract, or out of the refusal to perform the whole or any part thereof, or an agreement in writing between persons to submit to arbitration any controversy then existing between them, shall, provided the arbitration is held within the State of Oregon, be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

18, and that Kaplan had authority to accept plaintiff's offer on behalf of defendant.

██ ██ Defendant next argues that the promise to not reapply for employment with plaintiff and the confidentiality clause are both provisions that by their terms cannot be performed within one year and, therefore, the contract violates the statute of frauds. ORS 41.580(1)(a).[6] Plaintiff argues that the statute is inapplicable because the provisions regarding forbearance could be completed within one year. We agree with plaintiff that the nature of the provisions places them outside the purview of ORS 41.580. In *Duniway v. Wiley*, 85 Or 86, 89, 166 P 45 (1917), the court said:

> "In general, a verbal stipulation to render some particular service which fixes no definite or contingent time for its performance, but which is capable of performance within one year after the same is made, is not controlled by the statute, although the act probably will not be, and was not expected to be fulfilled within that time."

In this case, if defendant were to die within a year after execution of the agreement, the promises of forbearance would be wholly completed. Therefore, the statute of frauds does not apply to the agreement. *See Corbin on Contracts* § 453 (1950).

Defendant also argues that specific performance is not available because it affects the rights of her union, a nonparty. She argues:

> "The union's concurrence was needed to stop the grievance process, and the union remained committed to go ahead with the grievance to protect the rights of other nurses."

The agreement between defendant and plaintiff requires defendant to prepare and file the document necessary to initiate the dismissal of her grievance. The fact that it does not address the union's actions in any way does not affect the

---

[6] ORS 41.580(1)(a) provides:

"In the following cases the agreement is void unless it, or some note or memorandum thereof, expressing the consideration, is in writing and subscribed by the party to be charged, or by the lawfully authorized agent of the party; evidence, therefore of the agreement shall not be received other than the writing, or secondary evidence of its contents in the cases prescribed by law:

"(a) An agreement that by its terms is not to be performed within a year from the making."

enforceability of defendant's obligations under the agreement.

Finally, defendant argues that plaintiff does not have "clean hands" and, therefore, requiring specific performance would be inequitable. She says:

"[S]pecific performance of an alleged agreement that [defendant] had never agreed to and that contained terms she had never heard of would be inequitable. Kaiser engaged in unfair conduct threatening [defendant] and making false or exaggerated statements about her conduct. * * * The threats included threats to take action against her nursing license. Kaiser's inequitable advantage is demonstrated by the result it is attempting to achieve by this litigation: The victim of a sexual assault at the workplace would be forced to resign while the perpetrator of the assault will remain employed."

There is no evidence that defendant was under duress at the mediation conference nor is there evidence that plaintiff was "overreaching." Defendant was represented by counsel, and a professional neutral mediator presided over the process. Plaintiff says that "vigorous negotiation is not 'unfair conduct.' " In the context of the circumstances of this case, we agree with plaintiff.

In summary, defendant is entitled to a declaration that the oral agreement of August 18, 1991, is a valid and enforceable agreement. The settlement agreement is specifically enforceable according to the terms agreed upon in the oral discussion and memorialized in the written document entitled "Essential Terms of the Agreement." Because we find that the parties agreed to arbitrate according to the rules of the American Arbitration Association, and those rules provide a method for plaintiff to proceed unilaterally with arbitration, the judgment should provide an arbitration provision that incorporates those rules. We decline to grant plaintiff's request for a preliminary injunction, because that would be premature on this record. *See Shannon v. Swyers*, 129 Or App 573, 579-80, 879 P2d 1339 (1994).

Reversed and remanded for entry of judgment consistent with this opinion.