Argued and submitted March 30; supplemental judgment for spousal support reversed and remanded, supplemental judgment for attorney fees vacated and remanded September 8; on respondent's petition for reconsideration filed September 21, and response to petition for reconsideration filed October 5, reconsideration allowed by opinion December 29, 2016
See 283 Or App 200, ___ P3d ___ (2016)

In the Matter of the Marriage of

Julie A. HAGGERTY,
nka Julie Ann Blair,
*Petitioner-Respondent,*
*and*

Ancer L. HAGGERTY,
*Respondent-Appellant.*

Multnomah County Circuit Court
100463778; A157822

380 P3d 1176

Paula J. Kurshner, Judge.

W. Michael Gillette argued the cause for appellant. With him on the briefs were Leora Coleman-Fire and Schwabe, Williamson & Wyatt, P.C.

Philip F. Schuster, II, argued the cause and filed the brief for respondent.

Before Duncan, Presiding Judge, and DeVore, Judge, and Flynn, Judge.

**DEVORE, J.**

This is husband's second appeal challenging spousal support in this dissolution case. Previously, we remanded the case to the trial court for the court to decide whether the parties had entered into a settlement agreement and, if there was an agreement, whether the terms of that agreement were within the range of what would be just and equitable under the circumstances. *Haggerty and Haggerty*, 261 Or App 159, 322 P3d 1101 (2014) (*Haggerty I*). After a rehearing, the trial court decided that the parties had not entered into a settlement agreement and that, even if they had, the settlement agreement would not be within the range of that which is just and equitable. Husband assigns error to both rulings and to the award to wife of attorney fees. In response, wife denies that she agreed to a settlement; she asserts that, even if she did agree, her agreement was due to duress or to unilateral mistake; and she argues that the agreement would be outside the permissible range of agreements.

We conclude that the standard by which the trial court determined that wife had not agreed was erroneous. We reverse and remand for the trial court to make a decision on the facts in the record but with the standard we describe here. Because the remaining issues may arise on remand, we conclude that, on these facts, duress and unilateral mistake do not afford a basis to disregard an agreement. We conclude that the putative agreement, if made, was within the range of that which is just and equitable. Finally, we vacate the judgment on attorney fees in light of our remand.

## I.  BACKGROUND

We begin by recalling the facts from *Haggerty I*, and then summarize the evidence about the settlement from the rehearing.

"The parties in this case were married for 27 years and, at the time of trial, wife was 61 and husband was 66. Wife was a retired school principal, part-time substitute teacher, and an author of children's books. Husband was a senior judge with the United States District Court. At the time of the dissolution, husband's monthly gross income was $17,734, consisting of Social Security of $1,435,

a veteran's association pension of $875, PERS benefits of $924, and $14,500 for his work as a senior federal judge. Wife's monthly gross income from PERS was $2,965. Both parties had had health issues in the past but were medically stable at the time of trial.

"On April 12, 2011, the day before the dissolution trial began, husband filed a motion asserting that, on October 7 and 29, 2010, the parties and their attorneys had met with a mediator and 'reached an oral agreement which [the mediator] confirmed by reporting the case as settled to Husband's counsel.' However, wife did not sign a settlement agreement or a stipulated judgment. According to husband, the terms of the oral agreement were, in relevant part, that (1) wife would receive indefinite spousal support of $4,000 per month, (2) wife would receive $50,000 in life insurance, and (3) the parties would file a joint tax return for 2010. * * * [Husband] asserted that the agreement was 'final and enforceable' and that wife 'had breached her contractual obligation' and, therefore, husband asked the court to 'enforce the Mediated Settlement Agreement by signing a general judgment to be tendered by Husband's counsel.'"

*Id.* at 161-62 (brackets in original).[1]

At the time of two mediation sessions in October 2010, wife was represented by attorney Yates. Shortly after

---

[1] In *Haggerty I*, we noted with more detail that "[i]n his motion, husband outlined what he asserted were the material terms of the parties' agreement":

"1) Spousal support would be awarded to Wife at $4,000 per month indefinitely. Such amount would be deducted from Husband's salary;

"2) Husband would continue to pay his [Judicial Survivors' Annuities System] JSAS payment of $319 per month to provide wife with an annuity in the event of his death;

"3) Wife would receive $50,000 in life insurance which would be partitioned off of Husband's present life insurance;

"4) The parties would file a joint tax return for 2010, and Husband would pay tax consequences and receive any tax refund which historically had been de minimus;

"5) Wife would receive the parties' beach house. Husband would pay the beach house taxes through January 1, 2011;

"6) Husband would be awarded the family residence with all encumbrances;

"7) Wife would be allowed to remove her remaining personal effects * * *;

"8) The parties would each be awarded their separate property, IRA's, bank accounts, automobiles, and credit card debts."

261 Or App at 162 n 3 (internal quotation marks omitted).

the second session, wife terminated her engagement of Yates and filed a bar complaint against him. She retained attorney Villa-Smith. Before trial, however, Villa-Smith became a judge and discontinued her representation of wife. Wife went to trial in April 2011 with a third attorney, Pekelder.

At trial, the court denied husband's motion to enforce a settlement agreement. The court did not, however, make a determination whether a valid agreement between the parties existed. The court divided the parties' property and concluded that there would be no equalizing judgment. *Id.* at 163-64. The court awarded wife $7,000 per month in maintenance spousal support. Husband appealed the judgment.

In *Haggerty I*, we observed that, "even when they are not incorporated into a judgment, marital settlement agreements 'enjoy presumptive enforceability.'" *Id.* at 166 (quoting *Brown and Brown*, 259 Or App 618, 627, 315 P3d 422 (2013), *rev den*, 355 Or 142 (2014)). We explained that, "where there is a validly executed settlement agreement between the parties, the court must evaluate the terms of that agreement and should enforce them if they are within the range of what is just and equitable under the circumstances." *Id.* at 167 (citing *Grossman and Grossman*, 338 Or 99, 106 P3d 618 (2005)). We remanded the case for the trial court to determine whether the parties had entered into a valid settlement agreement and, if so, whether the terms of that settlement were within a range of what is just and equitable.

On remand, the parties appeared for a three-day rehearing in June 2014. The trial court properly understood that it should make those two determinations, explaining,

"I believe my instructions from the Court of Appeals are to make a determination whether there was a settlement; and if I find the answer to that question is yes, then I have—still have my authority as a judge to approve it or not approve it, and to decide whether the 4,000—whether the $4,000— there's no dispute about what the settlement—I put that in quotes. Whether $4,000 a month and $50,0000 in life insurance is fair and equitable and *within the bounds of*

*what's allowed,* I'll put it that way. And that's the issue ∗∗∗."

(Emphasis added.) Wife declared her monthly financial need to be $6,140. On appeal here, she restates that figure as $5,821.[2]

The parties did not memorialize a settlement agreement in writing. Given the absence of a written agreement, husband offered testimony and exhibits at the rehearing to show that the parties had reached an oral agreement to settle the case on October 29, 2010.

Wife's first attorney, Yates, testified that, after the first mediation session on October 7, 2010, the parties had reached a "tentative agreement" on "a number of issues" in the dissolution. He mailed wife a "fairly detailed letter outlining what had happened at the mediation, what issues [he] thought [the parties] had tentatively resolved, [and] what issues remained to be resolved." An email to Yates from wife after that first mediation session stated that she was willing to accept a spousal support award of $4,000 per month "when she started receiving some other source of income that she wasn't receiving at [the] time [of the first mediation]."[3]

Yates testified that he believed the remaining issues were resolved at the second session on October 29, 2010. At that time, he believed that the parties had reached a settlement "on all the terms." Yates wrote a letter to wife on November 1, 2010, enclosing a notice of a scheduled court proceeding. Yates told wife that the scheduled proceeding would be necessary in the *absence* of a settlement, but added, "[W]e are settled, and I will begin drafting the paperwork."

A few days later, wife discharged Yates, and he did not file any settlement documents. Yates testified that, after the second mediation session, the parties began dividing

---

[2] On appeal, wife states that her expenses should not include a JSAS premium of $319 per month, because the court ordered husband to continue making those payments. Her "actual total monthly expenses are $5,821 ($6,140 minus $319)."

[3] Evidence at the hearing reflected that wife would be eligible to draw $1,177 in Social Security benefits at the time of the second mediation, at the age of 62, although she did not intend to begin drawing on that benefit early.

their personal property, and a dispute developed over ownership of some of the items in their home. Although Yates was confident that a settlement had been reached between the parties, he could not independently recall some details of the agreement.

The mediator, Schulte, provided consistent testimony. He explained that he had believed the case settled at the October 29 mediation. Schulte recalled that the primary issue being mediated at that session was spousal support and that, by the end of the session, he was certain the parties had reached an agreement on that issue. Schulte had not believed that there were any unresolved or remaining issues. He recalled that Yates had told him "that they were satisfied and the case was settled." Although it was Schulte's ordinary practice to "write up something for everybody to sign," he testified that practice was not possible on this occasion because husband and his attorney had left Schulte's office shortly before Schulte finished speaking with Yates and wife. Schulte recalled that, as to division of property, the settlement agreement provided wife with "the long half."

Husband's trial attorney, McCaslin, provided testimony consistent with Yates and Schulte. He testified that Schulte had called his office shortly after McCaslin and husband had left the mediation and that Schulte had told him "that the case was settled." McCaslin also testified that he had communicated the terms of the settlement agreement, as he understood them, to wife's second attorney, Villa-Smith. In a letter of December 20, 2010, he reported to wife's new attorney:

"The settlement we reached *** was that [husband] would pay $4,000 in spousal and the JSAS payment in the amount of $320, for a total spousal support monthly of $4,320.

"In reference to life insurance, [wife] wanted $50,000 partitioned off and the remaining beneficiaries to be the parties' children. This was acceptable to [husband]."[4]

---

[4] The letter to Villa-Smith included wife's proposed distribution of assets and liabilities that had been prepared by Yates for the October 7, 2010, mediation.

At the rehearing, McCaslin reiterated the terms of what he understood to be the settlement agreement:

> "The terms of [the] settlement were that [husband] was to pay $4,000 spousal support indefinite. He was to maintain the JSAS payment of $319 per month. That he would receive the family residence in the City of Portland, and that [wife] would receive the Lincoln City beach house. That they would file a tax return at 2010, and [husband] would be responsible for any tax payment and receive any tax refund. That [wife] would remove personal property via a list from the family residence. And that the 8.010 would apply, no equalizing judgment. Those were the terms.
>
> "* * * * *
>
> "* * * [Husband] would pay the property taxes that were due [on the beach house]."

At the rehearing, wife urged four theories to avoid recognition of a settlement. First, she insisted that she had not assented to a settlement agreement; second, she contended that any agreement on her part was the result of duress or undue pressure; third, she asserted that, if she did agree, it was the result of unilateral mistake; and she argued, finally, that the agreement should not be found to be just and equitable.

Wife testified that she had become confused by the end of the October 29 mediation and that she "finally just broke down, and * * * said, 'Okay, but I don't agree. Yes, but I don't agree.'" She could not recall the terms of the final offer. When asked why she had said, "Yes" to an offer, wife explained that she did not believe that there would be an enforceable agreement if she did not sign anything.[5] Wife gave two other accounts of what she had actually said at the mediation. Those accounts were given when she contended that she acted under duress. One account was given before the rehearing and the other account was given at another point in her testimony at the rehearing.

In January 2013, wife had written a letter to the Oregon State Bar in which she complained that Yates

---

[5] Wife acknowledged that, at the time of the October 29 mediation, there had not been a dispute as to personal property, vehicles, homes, IRA accounts, personal banking accounts, and respective responsibility for any credit card debt.

had been unprepared for mediation, overbilled, and pressured her to accept the settlement offer. She wrote, "At first Mr. Yates wanted me to settle for $3,400 a month, [and] they offered $4,000 and no more with $50,000 life insurance." She complained:

> "I was under duress the day of Mediation. Mr. Yates insisted that this was a good deal, when I repeatedly told him it wasn't, and that I did not agree. He said this was good and that he was not going to court. He said this was the best I could do and that I needed to take the offer. I had already paid him over $22,000. Each month I paid him in full. He made me feel trapped *so I verbally agreed*, but knew it was not right. I was not going to and did not sign anything!"

(Emphasis added; boldface omitted.)

Similarly, at the rehearing, wife contended that she "was under duress" at the time of the mediation and that she wanted to leave before accruing a larger bill. She testified,

> "I looked at the time, and I thought these guys are—keep offering me different things. I don't know what they're offering me. And I want to get out of here because I'm paying them too much money *** just to be sitting here and disagreeing. So I wanted to get out of the room and I said, *if I just say yes*, they're going to let me go and I can get out. *And that's what I did.*"

(Emphases added.) In relation to duress, wife explained that she had been awake very early on the morning of the mediation and had not eaten anything. She said that she was under a significant amount of emotional strain, generally, in addition to those circumstances. Wife also presented witnesses who had spoken with her on the day of the October 29 mediation. They said that wife was tired and emotional, that she wanted to leave the mediation session, and that she was unsatisfied with the settlement offers.

As to unilateral mistake, wife testified that husband had told her, at some point in their marriage, that "'if you don't sign anything, it didn't happen.'" His statement did not occur in the mediation sessions; wife did not have contact with husband at the mediation, because Schulte had used a "shuttle" method of working with the parties.

Before trial, husband made an additional settlement offer to increase spousal support to $4,500, to remove the JSAS payment, and to increase life insurance to $250,000. McCaslin testified that, although husband believed a settlement had already been reached at the October 29 mediation session, he had made the offer as an effort to avoid going to trial.[6]

Two experts were called at the rehearing. Husband's expert testified that the settlement agreement provided wife with the "long half" of the property distribution, when considering the overall distribution of assets and liabilities, because wife's share of the assets was $1,202,195, and husband's share was $778,248.[7] Wife's expert testified that there would be an income inequity, favoring husband, after considering the consequences of taxes.[8]

The trial court ruled that the parties had not reached a settlement agreement and that, even if the parties had reached an agreement, the terms were not just and equitable under the circumstances. The trial court stated:

"[O]verall I find [both parties] credible with some minor exceptions. And that's because the—in looking at the totality of all of this, each of them thought what was happening here was different from what the other person thought, the end result being the necessary—[husband's attorney] used the word—used the term 'meeting of the minds.' I don't know if that's the right term to use in this case. *In any case, whatever we all mean by that, that did not occur in this case, and this settlement was not effectuated.*

---

[6] Husband similarly testified, "I wasn't saying that I didn't think that we had an agreement. I was saying, 'Look, you're saying we don't have an agreement. I will change the terms up to $4,500 insofar as spousal support, but I'm never going to give you the million dollars.'"

[7] Wife does not make a factual challenge to these calculations. She argues on appeal that the particular property that would be awarded to wife lacked "income-producing potential" and that wife would not "receive the security of highly liquid, low risk assets in the property division."

[8] Wife's expert prepared tax consequence calculations assuming that wife's income would include $7,000 in monthly spousal support payments. The expert did not prepare any calculations based on an award of $4,000, nor was that evidence otherwise introduced at the hearing. On appeal, wife attempts to develop an argument, based on an award of $4,000 and contending that she will suffer a financial deficit after tax liability is taken into account. That evidence, however, is not in the record, and an expert would have been required to make those calculations.

"***** 

"I recognize the legalities. I understand all of that. I *think there's some reason to believe here that was an issue for her in the totality of all this. I cannot find and I do not find—I find that she did not voluntarily and intelligently reach a settlement with full understanding that that was it and she was bound by all of its aspects.* And I think everyone's agreed that there were aspects that weren't completed in mediation. That's not uncommon in these cases. I recognize that.

"*****

"Anyway, let me just say though I find there was no settlement, I also want to say this for the record. I have no idea whether this case is going to be appealed. Had I found there was a settlement, I would not have found that 4,000 a month was just and proper in the circumstances of this case, and therefore would not have found that $50,000 in life insurance to secure the spousal support was also just and proper in the context of this case."

(Emphases added.) The court further observed that nothing had been filed to enforce a settlement agreement until just before trial and that wife's discharge of Yates within days of the mediation should have signaled that there was a problem.

Husband now brings this appeal, challenging the trial court's rulings, first, as to whether the parties had an enforceable settlement agreement, and second, as to whether that agreement was just and equitable under the circumstances. He also assigns error to the trial court's award of attorney fees to wife. For her part, wife denies that there was an agreement, contends that any agreement was only the result of duress or unilateral mistake, and contends that the purported agreement would be outside the range of permissible agreements.

## II.   SETTLEMENT AGREEMENT

We begin with the issue whether the parties had reached a settlement agreement. In its ruling, the trial court commented, "whatever we all mean" by "the term 'meeting of the minds,'" that "did not occur in this case." The trial court concluded that "this settlement was not effectuated"

because wife "did not *voluntarily and intelligently* reach a settlement *with full understanding* that *that was it* and she was *bound* by all of its aspects." (Emphases added.) We conclude the court erred in employing a subjective standard of assent.

## A. *Objective Assent*

A settlement is a contract, and whether a contract exists is a question of law. *Baldwin and Baldwin*, 215 Or App 203, 207, 168 P3d 1233 (2007). "Oregon subscribes to an objective theory of contracts, which means that whether the parties entered into a contract does not depend on the parties having the same subjective understanding of the agreement. Rather, it depends on whether the parties agreed to the same express terms of the contract." *Id.*[9] We have observed that the absence of "a signed agreement is not dispositive" because "'[w]hen parties agree on the essential terms of a contract and there is nothing left for future negotiations, the fact that they also intended there to be a future writing that expresses their agreement more formally does not affect the immediately binding nature of the agreement.'" *Id.* (quoting *Hughes v. Misar*, 189 Or App 258, 264, 76 P3d 111 (2003), *rev den*, 336 Or 615 (2004)).

In this case, the trial court erred because it tested wife's assent in terms of a "meeting of the minds" in the subjective sense and whether wife "voluntarily and intelligently" assented "with a full understanding" that she would be bound. Unless expressed, it is immaterial that wife had a different subjective understanding of the effect of her communications at the October 29 mediation. *Newton/Boldt v. Newton*, 192 Or App 386, 392, 86 P3d 49, *rev den*, 337 Or 84 (2004), *cert den*, 543 US 1173 (2005) ("whether parties enter

---

[9] Wife contends that, under *Aska and Hasson*, 278 Or App 48, 373 P3d 1219 (2016), where a party does not unequivocally assent to a settlement agreement on the record, it is error for a trial court to enter a stipulated judgment. That case, however, concerned a stipulated judgment in a marital dissolution proceeding controlled by ORS 107.104. As we explained in *Haggerty I*, "the alleged agreement does not fit within one of the categories outlined in ORS 107.104(2)—it was not set forth in a stipulated judgment signed by the parties, a judgment resulting from a settlement on the record, or a judgment incorporating a marital settlement agreement. Therefore, ORS 107.104(2) does not apply." 261 Or App at 166. Further, in *Aska*, there was no evidence that wife had assented to the disputed term of settlement.

into a contract does not depend on their uncommunicated subjective understanding"). Even the parties agree—at least in theory—that an objective standard applies to contract formation.

Wife nevertheless argues that a mediated settlement agreement of a domestic relations matter must be treated differently because it requires the trial court's approval. *See Haggerty I*, 261 Or App at 167 ("where there is a validly executed settlement agreement between the parties, the court must evaluate the terms of that agreement and should enforce them if they are within the range of what is just and equitable under the circumstances"). That argument, however, does not address the central question at issue—that is, whether the parties reached an agreement on the material terms of a contract. Wife's argument relates, instead, to whether the agreement was just and equitable under the circumstances—the issue that we will address in our discussion of husband's second assignment of error. *See Grossman*, 338 Or at 106-07 (trial court should accept a marital settlement agreement that falls inside range of what is just and proper); *Brown*, 259 Or App at 627 ("agreements relating to support enjoy presumptive enforceability" but court maintains "discretion not to approve an agreement" that is not just and proper).

On the central issue of objective assent, wife contends that her statement, "Yes, *but I don't agree*," was not "unqualified acceptance * * * of husband's offer to pay $4,000 in spousal support" because it was "ambiguous and equivocal." (Emphasis added.) Generally, an acceptance must be "unconditional, unequivocal and unambiguous and must not change, add to or qualify the terms of the offer." *Wagner v. Rainier Mfg. Co.*, 230 Or 531, 538-41, 371 P2d 274 (1962) (timber company's response to proposal, expecting additional terms, *i.e.*, a performance bond and financial statement, was not an unqualified acceptance of logger's proposal); *Blakeslee v. Davoudi*, 54 Or App 9, 14-15, 633 P2d 857 (1981) (lessees never told lessors that they exercised the option to renew lease and they appeared to condition renewal upon lessors undertaking, at their expense, to expand and improve the premises); *see also State v. Chavez*, 211 Or App 142, 145, 153 P3d 175 (2007) (guilty plea is subject to commercial

contract principles; defendant held not to have accepted plea offer when delaying in order to consult with sister before accepting offer because he reserved the right to change his mind).

Despite her other descriptions of an unqualified assent, wife relies on her potentially ambiguous statement. Necessarily then, her reliance depends upon the potential qualifier, "Yes, *but I don't agree*," as having been spoken aloud rather than thought to herself or expressed at some earlier moment. If spoken aloud, her statement would need to mean more than an expression of reluctance or an indication of displeasure; it must express a lack of assent to the settlement. That said, wife insists that she did not actually accept the offer of settlement.[10]

Husband contends otherwise. He asserts that two of wife's three accounts of assent were unqualified. He argues that Schulte and Yates both communicated that wife unambiguously agreed to the proposed settlement without any remaining material issues and that the mediator unambiguously communicated her apparent assent to husband's counsel McCaslin.[11] Thereafter, husband argues, the parties evidenced their assent when they began distributing their property shortly after the mediation. Husband contends that all the objective circumstances leave but one conclusion, as a matter of law, that the parties had reached a settlement. *See Kaiser Foundation Health Plan v. Doe*, 136 Or App 566, 575, 903 P2d 375 (1995), *adh'd to as modified on recons*, 138 Or App 428, 908 P2d 850, *rev den*, 324 Or 394 (1996) (concluding that there was a settlement agreement where the

---

[10] We reject wife's contention that she did not objectively manifest an intent to agree because she was tired, hungry, and emotional the day of the mediation and because she subsequently stated that she was "unable to comprehend many of the consequences of husband's offer[.]" Her understanding or emotional state may relate to duress but not to objective indications of assent.

[11] We caution that we regard the evidence of the communications of the parties' attorneys only as evidence of *wife's* assent. We are not asked to consider the attorney's communications for purposes of determining whether the attorneys, as agents of their clients, had bound their clients. *See Kaiser Foundation Health Plan v. Doe*, 136 Or App 566, 903 P2d 375 (1995), *adh'd to as modified on recons*, 138 Or App 428, 908 P2d 850, *rev den*, 324 Or 394 (1996) (where attorneys reached agreement on the essential terms of a settlement and the defendant accepted those terms, the defendant's acceptance was sufficient to make the settlement immediately binding). That theory is not before us on appeal.

parties' objective manifestations "have sufficiently expressed the terms they agreed upon").

We cannot agree that the question of acceptance can be resolved as a matter of law. Wife's preferred version of her communications, "Yes, but I don't agree," must be assessed in relation to her own unqualified accounts of assent, the circumstantial evidence of the statements of the mediator and attorneys, and the conduct of the parties at the time that a settlement is alleged to have occurred. The determination of assent to settlement remains a factual determination for the trial court—a determination to be reached with an objective standard of assent based on the record already made.

## B.  *Duress*

Because the remaining issues are fully briefed, are fully developed in the record before us, may arise upon remand, and would be considered on the same record, we address wife's several arguments that she interposes as defenses to recognition or enforcement of a settlement agreement. We address those issues to avoid the prospect of further delay in resolution of this dissolution.

Wife contends that she was pressured into agreeing to a settlement by Yates and Schulte. We have reviewed the record in the light most favorable to the wife and conclude that it is insufficient to permit a conclusion that wife was subject to any wrongful act or threat that compelled her to assent to a settlement agreement. *See Jones v. Jones*, 276 Or 1125, 1128, 557 P2d 239 (1976) (defining duress as "any wrongful act or threat thereof which actually compels the victim, against his will, either to act or to forbear from acting"); *Brown and Shiban*, 155 Or App 238, 243, 963 P2d 105 (1998), *rev den*, 328 Or 594 (1999) (applying *Jones* to domestic relations case).

## C.  *Unilateral Mistake*

Wife contends that any agreement was the result of unilateral mistake. Wife did not present or develop an argument that she was mistaken as to a fact basic to the agreement. *Newton*, 192 Or App at 392-93 (to prove unilateral mistake, a plaintiff must prove that the mistake was about a fact basic to the settlement and that the defendant

knew or should have known that the plaintiff held that mistaken understanding). Rather, wife focuses on her mistake as to a legal question. That legal question is whether the lack of a signed writing renders unenforceable an agreement actually reached. She claims that husband stated to her, at some point during their marriage, that agreements must be in writing. That legal misimpression, which was not a negotiated term nor a term basic to what was agreed, is not the type of mistake that supports a theory of unilateral mistake. *Id.; see also State v. Heisser*, 350 Or 12, 26 n 11, 249 P3d 113 (2011) (concluding that unilateral mistake would not provide relief where party was not mistaken about an underlying fact but rather "mistaken as to the legal effect" of a plea agreement).[12]

### III. ENFORCEABILITY

We turn to husband's second assignment of error, challenging the trial court's determination that, in any event, the settlement agreement was not within the range of what was just and equitable under the circumstances. Ordinarily, when determining spousal support, a trial court makes its award in light of what it determines is just and equitable under the circumstances of the case. *Mills and Mills*, 141 Or App 58, 61, 917 P2d 498 (1996). In determining the amount and the duration of the support, if any,

> "the factors that the trial court considers include, but are not limited to, the duration of the marriage; the age of the parties; the health of the parties, including their physical, mental, and emotional condition; the standard of living established during the marriage; the relative income and earning capacity of the parties; a party's training, employment skills, and work experience; the financial needs and resources of each party; the tax consequences to each party; a party's custodial and child support responsibilities; and any other factors that the court deems just and equitable."

*DeAngeles and DeAngeles*, 273 Or App 88, 95, 359 P3d 371 (2015); *see also* ORS 107.105(1)(d)(C). "[T]he court's determination regarding 'what amount and duration of support

---

[12] The concept of unilateral mistake may well relate to the trial court's statement that wife "did not voluntarily and intelligently reach a settlement with full understanding that that was it and *she was bound* by all of its aspects." (Emphasis added.)

is just and equitable is discretionary' and we, accordingly, review for abuse of discretion." *Stuart and Ely*, 259 Or App 175, 180, 313 P3d 317 (2013) (quoting *Berg and Berg*, 250 Or App 1, 2, 279 P3d 286 (2012)).

This case comes in a somewhat different posture, because the parties may have reached a settlement agreement, and husband sought to enforce that agreement. *Pollock and Pollock*, 357 Or 575, 591, 355 P3d 117 (2015) ("Although a trial court should not substitute its judgment by rejecting a settlement that falls within the range of what is just and proper, the [trial] court has the ultimate authority to arrive at a just and proper property division by determining whether a settlement falls within that range."). Because marital settlement agreements relating to both property division and spousal support enjoy "presumptive enforceability," the court is not asked to exercise its discretion in the first instance; instead, the court reviews to ensure that the parties' agreement is within the *range* of what is just and proper (property division) or just and equitable (spousal support). *Brown*, 259 Or App at 627 (citing *Reeves and Elliott*, 237 Or App 126, 129, 238 P3d 427 (2010)); *see also Haggerty I*, 261 Or App at 167. Necessarily, reference to a "range" of permissible agreements means that there is not a single permissible result. Just as a trial court may, in the exercise of discretion, choose from among a variety of different, permissible results, so, too, may the parties themselves.

The circumstances may influence the terms of an agreement. The parties' perspective may differ from the perspective of a trial court that makes a spousal support award in the first instance. In a marital settlement, the parties may contemplate the risks, costs, and emotional toll of litigation, which can be avoided by reaching a settlement agreement. The parties may contemplate the value and import of their various assets in determining how to distribute them, and the parties have determined the relative importance of greater or lesser support, in relation to the manner of division of property. The parties' personal preferences may affect the agreement as a whole, including that part that is the amount and duration of spousal support.

Here, the trial court properly understood the applicable legal standard, articulating that the question before it was to determine whether the parties' agreement "is fair and equitable and within the bounds of what's allowed." In applying that standard, however, the court ruled that the parties' agreement, if there was one, was not just and equitable under the circumstances. That conclusion was erroneous.

As we noted at the outset, the parties were married for 27 years. At the time of trial, wife was 61 and husband was 66, and they were in stable health. Both parties had been employed in prominent positions—wife had worked in education for 30 years, including work as a school principal, and husband was a senior judge with the United States District Court. Husband's monthly gross income was $17,734, consisting of Social Security of $1,435, a veteran's association pension of $875, PERS benefits of $924, and $14,500 for his work as a senior federal judge. Wife's monthly gross income from PERS was $2,965, and she was eligible to receive social security benefits, although she had not drawn on social security at the time of trial and did not intend to do so until a later date.

Under the terms of the putative agreement, wife would receive an additional $4,000 per month as indefinite spousal support and $50,000 in life insurance. The spousal support award, combined with wife's other income, would exceed her declared monthly financial need. Under the parties' agreement, the assets would be divided such that wife would retain "the long half," taking $1,202,195 in assets, while husband would retain $778,248. Although she would receive roughly 60 percent of the parties' property—$423,947 more than husband, there would be no equalizing judgment against her.

As the reviewing court, "[o]ur role * * * is not to make our own determination of the 'just and equitable' amount of spousal support." *Morgan and Morgan*, 269 Or App 156, 166, 344 P3d 81, *rev den*, 357 Or 595 (2015). In a sense, the trial court's review of the parties' agreement is similar insofar as it, too, is a review function. Although there would remain a disparity in the parties' monthly incomes,

given the circumstances in this case—the parties' division of marital assets awarding wife "the long half," the absence of an equalizing judgment, and the indefinite nature of spousal support—we conclude that the agreed amount of $4,000 spousal support would not be outside the range of what would be just and equitable under the circumstances. *See Bailey and Bailey*, 248 Or App 271, 277, 273 P3d 263 (2012) (where husband earned $35,200 in taxable monthly income, concluding that it was "just and equitable to award wife transitional support of $1,500 and maintenance support of $5,500 for 18 months, so that the total spousal support award for that period will be $7,000 per month" and eventually decreasing spousal support thereafter to $4,000 per month, indefinitely). Therefore, we conclude that the trial court erred in determining that the putative settlement was outside of the range of agreements that are just and equitable.

## IV.   ATTORNEY FEES

In his final assignment of error, husband contends that the trial court erred in awarding attorney fees to wife. Because we conclude that assent must be reassessed and that this settlement, if any, was permissible, the factors upon which a fee award were based have changed substantially. The award of fees is vacated and remanded pending the outcome on remand.

## V.   CONCLUSION

The question of wife's assent remains for a determination using an objective standard based on the facts in the record. Wife's legal defenses to an agreement are unavailing. If the court finds that wife gave assent, then the case will be resolved on the agreement; if the court finds no assent, then the court will determine spousal support as it determines to be just and equitable.

Supplemental judgment for spousal support reversed and remanded; supplemental judgment for attorney fees vacated and remanded.